**Darryl Keith PINKINS, Appellant–
Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 45A03–0301–PC–30.**

Court of Appeals of Indiana.

Dec. 8, 2003.

Transfer Denied March 5, 2004.

Charles E. Stewart, Jr., Crown Point, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Andrew A. Kobe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Judge.

Appellant-defendant Darryl Keith Pinkins appeals his convictions for Rape,[1] a class A felony, Criminal Deviate Conduct,[2] a class A felony, and Robbery,[3] a class B felony, claiming that certain expert testimony was improperly offered, that an instruction given on accessory liability amounted to fundamental error and that evidence was improperly admitted regarding Pinkins's propensity to visit strip bars.

In this consolidated appeal, Pinkins also challenges the denial of his petition for post-conviction relief, contending that subsequent DNA testing constituted newly discovered evidence that entitled him to a new trial. Pinkins additionally claims that he received the ineffective assistance of trial counsel because his lawyer momentarily "dozed off" at the trial during the State's direct examination of a witness, that he failed to object to the victim's pretrial and in-court identification of him as one of the assailants, and that counsel was ineffective for failing to object to evidence regarding his propensity to patronize strip clubs. Concluding that no reversible error occurred, we affirm the judgments of the trial court and the post-conviction court.

## FACTS

Oftentimes, some might think that our opinions are viewed from a Monday morning quarterback's standpoint on those occasions where we determine that inadequate police work was performed in a certain circumstance. As the facts set forth below will demonstrate, we think this case is reflective of exemplary police work.

On December 7, 1989, at approximately 1:30 a.m., M.W. was on her way home from a friend's house when she stopped for a red light at an intersection in Hammond. Another vehicle rear-ended her, and M.W. exited her automobile to assess the damage.

The driver of the other vehicle, who M.W. later identified as Pinkins, got out of his car, approached M.W., and asked if "she was all right." Tr. p. 435. Before M.W. could respond, Pinkins grabbed her arm and began pushing her toward her car. Pinkins also reached for M.W.'s purse that was lodged between the front seats. Eventually, two other men approached and grabbed M.W. from behind. They dragged M.W. back to their car and shoved her into the backseat. M.W. de-

---

1. Indiana Code § 35–42–4–1.

2. I.C. § 35–42–4–2.

3. I.C. § 35–42–5–1.

scribed the vehicle as a dirty, light green full-sized four-door hardtop. M.W. then saw Pinkins and another man enter her car. Her purse, containing approximately twenty dollars, as well as a handgun belonging to her husband, were removed and never recovered.

When Pinkins and the other individual returned to the other vehicle, M.W. was asked questions about her husband and whether she had any children. M.W. observed that five men were at the scene. As the group traveled through Gary, the vehicle became stuck at some point. The driver then directed one of the men in the backseat with M.W. to get out and push the car. Another individual had M.W. cover her eyes and then told her, "Don't look at us, bitch, or we'll kill you." Tr. p. 468. A conversation then ensued among four or five of the individuals about what to·do. When the vehicle was eventually dislodged, the driver told the man in the backseat to start removing M.W.'s clothes. At some point, one of the individuals gave M.W. a green one-piece worker's coverall and was told to cover her face. M.W. was then stripped naked, and the man in the backseat engaged in sexual intercourse with M.W. After ejaculating, the man used M.W.'s coat to wipe his genitals. M.W. described this individual as having a round face with inch-long hair. He was wearing an army jacket and black jeans, and was 5′″ to 5′7″ in height. Thereafter, one of the other men forced M.W. to perform fellatio on him, while another had sexual intercourse with her. This man also wiped his genitals with M.W.'s jacket after the attack. M.W. also provided a description of this assailant that matched an individual by the name of William Durden.

Following this attack, the car stopped and one of the other suspects climbed into the back seat. He told the driver to proceed to a Phillips 66 gas station, where he began having sexual intercourse with M.W. and also attempted to penetrate M.W.'s anus. The suspect then continued raping M.W. and, like the others, used her jacket to wipe himself off after ejaculating.

M.W. was then raped by Pinkins and the fifth man. Both used the jacket after the incident. The fifth suspect then removed M.W.'s rings, and all of the suspects ordered her to get dressed. Shortly thereafter, at about 3:30 a.m., M.W. was pushed into her car and was permitted to drive away. After determining that she was near the Gary airport, M.W. was able to find her way home. When M.W. arrived, she told her husband about the attacks, and they contacted the police. Thereafter, M.W. was taken to the hospital in an ambulance. Upon her arrival, a thorough rape examination was performed and samples were collected. The attending physicians determined that M.W. was pregnant at the time of the assault, but she suffered a miscarriage twenty days later. Moreover, M.W. was bedridden for nearly twenty days as a result of the attack.

During the course of the investigation, the coveralls that the men had given M.W. to cover her face were analyzed. It was determined that "burners"—employees who work at scrap steel companies that use torches to slice steel into smaller pieces—are issued these coveralls or "greens" which are made of fire retardant material. Tr. p. 764, 766–67. The greens that were given to M.W. bore the imprint "WESTEX Lot 311." Tr. p. 812. Police traced all the coveralls that had been manufactured from the 34,659 yards of material marked WESTEX Lot 311, and the only coveralls unaccounted for that matched this identification were those that were purchased by Luria Brothers. Tr. p. 831. At the time of the incident, the Luria Brothers Company was a professional scrap management company for Bethle-

hem Steel. Tr. p. 759. A police detective subsequently determined after speaking with a Luria Brothers's plant manager, that Pinkins, William Durden and Roosevelt Glenn had each been issued two pairs of greens by the company on May 30, 1989. While Glenn had been employed as a "burner," he actually worked as a payload operator. The position of the soil stains, the lack of burn holes and the lack of staining to the back were consistent with the coveralls of a payloader. Thus, it was determined that the condition of the greens that M.W. had in her possession was consistent with Glenn's ownership.

It was further established that Durden, Glenn and Pinkins were each issued a new pair of greens on December 11, 1989—four days after the assault. Moreover, these three men drove to work together and associated with another individual by the name of Barry Jackson. Durden, Glenn and Pinkins all worked on December 6 on the three-to-eleven shift. When the men asked for the new greens, they explained to an assistant manager at Luria Brothers that they lost their original clothing because Glenn's vehicle had been stolen and the greens had been in the back of the car. However, no reports had been made of the alleged theft.

It was also learned that at approximately 11:30 p.m. on December 6, an Indiana State Police Officer observed Durden's vehicle on the side of the interstate and three men walking on an exit ramp. Although the trooper offered them a ride, they refused. When the three arrived at a gas station, Glenn stated that he telephoned his girlfriend at 11:46 p.m. She picked them up, and they took her home, explaining that they were going to cash their checks from work. It was discovered that the checks had been cashed at a Gary liquor store around 12:30 a.m. on December 7.

Pinkins then alleged that the men drove to an Amoco station, purchased two quarts of oil, and then returned to Durden's car. Pinkins stated that the passenger window had been shattered and someone had taken all their work clothes, including their greens. Pinkins stated that after adding the oil, he and Glenn followed Durden and Glenn drove him home. Contrary to Pinkins's version of the events, it was established that the only quart of oil purchased from the Amoco station occurred at 6:12 a.m. on December 7.

Three witnesses testified that when a vehicle's side window is broken, glass falls both inside and outside the vehicle, but no glass was found on the interstate in the area where Pinkins testified that the car broke down. Testimony also revealed that automobile glass was not swept from that area during December of 1989 or January, 1990.

It was also revealed that Pinkins and Glenn frequented two adult entertainment clubs that were in close proximity to each other. Durden would also accompany Pinkins to the clubs, but he did not patronize them as often as did Glenn. Employees of the Caddy Shack and Interlude Motel described Pinkins's appearance in December 1989 and also provided a description of his apparel. It was determined that Antoinette Washington and her husband checked into the Interlude Motel after midnight on the night of December 5–6, 1989. When they awoke in the morning, they discovered that their 1988 brown Oldsmobile Delta 88, which bore license plate number 96W2376, had been stolen.

The police investigation also revealed that on December 6, 1989, Jill Martin, a flight attendant, arrived at Chicago's O'Hare airport around 11:30 p.m., and she began to drive her father's tan Ford Escort to her parents' house in Valparaiso. At approximately 1:00 a.m., when she was

near Merrillville, another car rear-ended her. The driver of the other car pulled off the road, and Martin stopped behind it. Martin noted that it was a large car which bore the license plate number on the vehicle that was owned by the Washingtons. After the vehicles had stopped, an African–American male approached Martin and asked if she was "all right." Tr. p. 369–70. Two more men exited the vehicle and began walking toward Martin's car. Moments later, another truck approached the scene. The three men immediately returned to the vehicle and drove away. Martin later reported the incident to the police.

Using Martin's description of the outside of the vehicle and M.W.'s description of the inside of the car, the police determined that a 1973 Pontiac full-sized vehicle had been used in both incidents. Moreover, it was discovered that only nine individuals owned 1973 Pontiac full-sized vehicles with cloth seats in Lake and Porter counties in 1989. None of those automobiles had been reported stolen on December 6, and the only person who drove that type of vehicle to a steel mill was Gary Daniels. Both Martin and M.W. identified Daniels's car as the one involved in the incidents, and it was later determined that Daniels worked for an independent contractor that cleaned for the Luria Brothers business.

Daniels stated that he had parked his vehicle near his house after work between 10:30 p.m. and midnight on December 6 and that it was still there the next morning at around 6:00 or 7:00 a.m. On December 7, 1989, Daniels's Pontiac was placed in his garage, and he began driving his girlfriend's car. When the car was recovered from his garage, the police processed it for fingerprints. However, none were found in the vehicle—not even those belonging to Daniels.

During the investigation, forensic tests were conducted and bodily fluid evidence revealed that sperm was present on the vaginal and cervical smear slides, a cutting from M.W.'s sweater, and three cuttings from M.W.'s jacket. A company by the name of Cellmark Diagnostics (Cellmark) had analyzed the cervical smear, the cutting from M.W.'s sweater and multiple stains from the jacket. Cellmark found that three separate genetic codes were present. One code matched that of M.W., and the others did not match the codes that had been developed for the following individuals: Pinkins, Durden, Glenn, Barry Jackson, Gary Daniels, John Walter Burnett, and Edward Bernard Scott. The investigators also removed a hair from M.W.'s sweater that was consistent with Glenn's hair. Given the strength of the match and the uniqueness of Glenn's hair, it was unlikely that it came from anyone else.

Following the investigation, Detective Michael Solan, a lieutenant of the Hammond Police Department arrested Pinkins, Glenn, Durden, Barry Jackson and Gary Daniels at Luria Brothers on January 2, 1990. Detective Solan then went to M.W.'s residence to inform her about the progress of the case. While Detective Solan offered to show photographs of the five arrestees to M.W., she refused to look at them and pushed the stack away from her.

While Pinkins was in jail, he told another inmate that he and two of his friends were cashing their checks at a liquor store when a green car pulled up with a white woman in the backseat. Pinkins stated that the woman had some green coveralls over her head and that he had raped her. Pinkins also told the inmate that he was not concerned about DNA tests because he did not ejaculate inside of her. Pinkins also told the inmate that the victim had been raped by four other men.

On May 4, 1990, Jackson and his attorney were at the courthouse for a pretrial hearing. Pinkins, who was also present, approached them and told Jackson's attorney that he did not understand why Jackson was arrested because he had not been with the group on the evening of the incident. M.W. also chose to attend the court proceedings that morning and observed Pinkins as he was brought into the courtroom. At that moment, M.W. specifically recalled that Pinkins was the individual who had initially approached her in the early morning hours of December 7. When the two made eye contact, Pinkins shielded his face and sat down on the other side of the aisle. After the court hearing, M.W. told Detective Solan and the deputy prosecutor that Pinkins was one of her attackers.

At the conclusion of a nearly three-week-long jury trial on May 3, 1991, Pinkins was convicted of the charged offenses and was sentenced to forty years on the rape count, which was ordered to run consecutively with a sentence of twenty-five years on the criminal deviate conduct charge. As for the robbery count, the court sentenced Pinkins to ten years, which was ordered to run concurrently with the other sentences.

Thereafter, on July 15, 1991, Pinkins filed a praecipe with the clerk of the trial court for the purpose of taking a direct appeal. Then, on June 29, 1992, we permitted Pinkins to suspend his direct appeal so that he could file a petition for post-conviction relief. The original petition was filed on December 16, 1992, and amended on January 16, 2002. Pinkins claimed entitlement to relief on the grounds that his trial counsel was ineffective because he dozed for a moment during the trial and that he failed to make objections to evidence that had been admitted at the trial. Pinkins also alleged that the results of DNA testing that had been conducted in 2001 constituted newly discovered evidence that entitled him to a new trial.

On April 18, 2002, an evidentiary hearing commenced on the petition, and the post-conviction court accepted the submission of evidence until July 18, 2002. At the hearing, Juliette Harris, a DNA analyst from Cellmark, testified that new DNA testing had been performed with respect to some of the physical evidence in this case. However, she testified that the new report generated in May 2001 was essentially the same as the 1990 report that was admitted at the trial. In particular, Harris determined that the result of excluding Pinkins as a contributor to one of the two unknown genetic codes is the same in both reports.

William Drozda, who was Pinkins's trial counsel, also testified at the post-conviction hearing. He acknowledged falling asleep only briefly during the State's direct examination of a witness. Drozda testified that he suffered from sleep apnea and was taking over-the-counter medication during the trial to stay awake.

Drozda also did not view M.W.'s May 4, 1990 encounter with Pinkins as an identification procedure. Rather, he regarded it simply as M.W.'s behavior upon seeing Pinkins. Following the hearing, the post-conviction court entered findings of fact and conclusions of law denying Pinkins's request for relief. Pinkins now appeals the issues he has preserved on direct appeal as well as the alleged errors that occurred at the post-conviction relief stage.

### DISCUSSION AND DECISION

#### I. Arguments Presented on Direct Appeal

##### A. Broken Automobile Glass Testimony

■ Pinkins contends that he is entitled to a reversal because the trial court erred

in overruling his objection to the testimony of a highway maintenance worker concerning shattered automobile glass. Specifically, Pinkins argues that the State failed to lay a proper foundation establishing that the employee had any knowledge or expertise as to how shattered automobile glass might be scattered when a car window is broken. Thus, Pinkins maintains that the admission of this evidence was error because the State did not properly qualify the witness as an expert.

■ In resolving this issue, Pinkins correctly observes that we will review the trial court's determination of whether a witness is qualified to testify as an expert witness for an abuse of discretion. *Turner v. State*, 720 N.E.2d 440, 444 (Ind.Ct.App. 1999). The applicable rule here, Indiana Rule of Evidence 702(a), provides in relevant part that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." This rule essentially assigns a gatekeeping function to the trial court. Specifically, we note that for a witness to be qualified as an expert, two requirements must be met. First, the subject matter must be distinctly related to some scientific field, business, or profession beyond the knowledge of the average person. Second, the witness must have sufficient skill, knowledge, or experience in that area so that the opinion will aid the trier of fact. *Turner*, 720 N.E.2d at 444.

In this case, Robert Arvin testified that he had been employed by the Indiana Department of Transportation for ten years as a maintenance worker. Tr. p. 1574–75. He drove a snowplow in the winter months and was a street sweeper in the other months of the year on Interstate 80/94.

Tr. p. 1575–76. During the course of his duties, Arvin cleaned up glass that either was on the roadway or on the side of the road. Over Pinkins's objection, Arvin testified that automobile glass fractures into small chips and acknowledged that if glass had been deposited on the side of the highway on December 7, 1989, he would expect to find that glass present in the spring as long as there had not been an accident between December 7, 1989 and the spring of 1990. Tr. p. 1593. Arvin acknowledged at the trial that his knowledge of whether broken automobile glass would remain inside a vehicle was based upon seeing glass by the side of the highway.

Apparently, the State offered this testimony in an attempt to disprove and discredit Pinkins's version of the events that Durden's vehicle had broken down on December 6, 1989, and that when Durden, Glenn, and Pinkins returned with oil to start Durden's car, they discovered that Durden's automobile had been broken into, a window was broken, and their green coveralls had been stolen.

Pinkins maintains that the State presented no foundation indicating that Arvin had completed any study or had participated in the testing of shattered automobile glass. Additionally, there is no evidence in the record establishing that Arvin had any knowledge or expertise in determining how much glass from a broken car window might fall into the car and how much would fall onto the road. It is therefore apparent that Arvin's opinion about automobile glass falling out of a vehicle was based solely upon the fact that he had observed glass on the highway. We also note that it was not established whether Arvin had ever seen glass being broken from a car window to determine whether the glass shattered inside or outside of the car. That said, we agree with Pinkins that

Arvin should not have been qualified as an expert witness, and he should not have been permitted to testify with regard to this issue.

■ Our resolution of this issue does not stop here, however, inasmuch as our supreme court has determined that "[e]ven the erroneous admission of evidence which is cumulative of other evidence admitted without objection does not constitute reversible error." *Wolfe v. State*, 562 N.E.2d 414, 421 (Ind.1990). In this case, Indiana State Police Officer Alan Jamerson testified that when a vehicle's side window is smashed, glass will fall inside and outside of the car. Tr. p. 1630. Additionally, Detective Solan testified that he found two Escorts similar to that owned by Durden and broke out the passenger windows with different amounts of force. In both instances, he acknowledged that glass fell inside and outside the vehicle. Tr. p. 2172–73, 2208. Pinkins did not object to the testimony offered by Officer Jamerson or Detective Solan. Therefore, even though Arvin's testimony may have been erroneously admitted, reversible error does not result because it was merely cumulative of the evidence that was not objected to, and any error was harmless. Thus, Pinkins's claim must fail.

### B. Instruction on Accessory Liability

■ Pinkins also claims that the trial court's instruction on accessory liability was erroneous. Specifically, Pinkins contends that the instruction given on this issue created a mandatory presumption in violation of his due process rights.

At trial, the following final instruction was given to the jury:

It is a fundamental principle of law that where two or more persons engage in the commission of an unlawful act, each person is criminally responsible for the actions of each other person which were a probable and natural consequence of their common plan even though not intended as part of their original plan. It is not essential that participation of any one person to each element of the crime be established.

Under Indiana law, 'A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense, even if the other person:

1. has not been prosecuted for the offense;

2. has not been convicted of the offense; or

3. has been acquitted of the offense.'

To aid under the law is to knowingly aid, support, help, or assist in the commission of the crime. Mere presence at the scene of the crime and knowledge that a crime is being committed are not sufficient to allow an inference of participation. It is being present at the time and place, and knowingly doing some act to render aid to the actual perpetrator of the crime.

The presence of a person at the scene of the commission of the crime and companionship with another person engaged in the commission of the crime and a course of conduct before and after the offense are circumstances which may be considered in determining whether such person aided and abetted the commission of such crime.

Appellant's App. p. 171.

Inasmuch as Pinkins did not object to this instruction at trial, he claims that fundamental error occurred and relies upon *Walker v. State*, 769 N.E.2d 1162, 1171 (Ind.Ct.App.2002), *trans. denied*, in support of his argument. The rationale set forth in *Walker*, which found that the instruction set forth above was unconstitutional, was recently revisited by our su-

preme court in *McCorker v. State,* 797 N.E.2d 257 (Ind.2003). In *McCorker,* it was determined that such an instruction did not amount to reversible error and was not unconstitutional. Specifically, the *McCorker* court observed that:

[The instruction] did not instruct the jury to presume or otherwise find *intent* (or any other element of the crimes of which Defendant was accused) from the consequences of Defendant's acts. Rather, it instructed the jury that it could impose *liability or guilt* if it found that Defendant knowingly aided, supported, helped, or assisted [the co-defendant] in the commission of the charged crimes. This was a correct statement of law, a permissible presumption that did not impinge in any way on the jury's fact-finding prerogative. Furthermore, [the instruction] contains language helpful to Defendant to the effect that mere presence at the scene of the crime and knowledge that a crime was being committed were not sufficient to allow an inference of participation.

Although for the reasons set forth above, we direct trial courts not to use this formulation in instructing juries on accomplice liability, it was not . . . error to give [the instruction].

This analysis disapproves the holding in *Walker v. State,* 769 N.E.2d 1162, 1171 (Ind.Ct.App.2002), *trans. denied,* which found the exact same instruction to be unconstitutional. (*Walker* held that the words 'fundamental principle' denoted a level of importance that ultimately created a presumption. As our analysis above suggests, we do not necessarily disagree with this characterization. But the presumption, if there was one, created here was permissive—the jury could find or presume liability or

guilt if it found Defendant aided the co-defendant.)

*Id.* at 265–66.

In light of the recent pronouncement in *McCorker,* we find that the trial court did not commit fundamental error when it gave this instruction, and Pinkins's claim must fail. As our supreme court observed in *McCorker,* however, we urge our trial courts not to give this instruction with regard to accomplice liability.

### C. Evidence Regarding Pinkins's Patronage of Bars

Pinkins claims that fundamental error occurred when the trial court admitted evidence at trial that Pinkins patronized certain strip bars and associated with the dancers who worked at the clubs. Specifically, he maintains that the admission of this testimony was error because it violated the provisions of Indiana Evidence Rule 404(b), in that it amounted to uncharged misconduct. Therefore, Pinkins contends that the evidence unduly prejudiced him and resulted in the denial of due process and the right to a fair trial.

In addressing this contention, we note, and Pinkins concedes, that he did not object to this evidence at trial. In such circumstances, the argument presented on appeal is typically waived. *See Goodwin v. State,* 783 N.E.2d 686, 687 (Ind.2003) (holding that the failure to object at trial customarily means that a party has not preserved the claim on appeal). However, in an effort to avoid waiver, Pinkins maintains that the admission of such testimony amounted to fundamental error. This exception permits reversal when there has been a "blatant violation of basic principles that denies a defendant fundamental due process." *Id.* When raising an issue as fundamental error, the defendant bears the burden of proving that such a violation occurred that rendered the trial unfair to

the defendant. *Baird v. State*, 604 N.E.2d 1170, 1184 (Ind.1992).

■ When Pinkins's trial commenced, our supreme court had not yet adopted Indiana Rule of Evidence 404(b), which prohibits the admissibility of "other crimes, wrongs, or acts ... to prove the character of a person in order to show action in conformity therewith." However, at the time of Pinkins's trial, a similar rule that had been established by our case law provided that "[e]vidence of uncharged misconduct is generally inadmissible if its sole relevance is to show that the defendant's general character is bad and that he therefore has a tendency to commit crimes." *Penley v. State*, 506 N.E.2d 806, 808 (Ind.1987).

In this case, several witnesses testified that Pinkins, Glenn, Durden and several other co-workers and acquaintances periodically visited the Caddy Shack and the Interlude Motel. Tr. p. 1707–09, 1714–15, 1750, 1759, 1764–66, 1787, 1789–90. One of the witnesses testified that Pinkins visited the Caddy Shack twice a week. Tr. p. 1818. Our review of the record demonstrates that the primary purpose that the State called these witnesses to testify was for them to describe Pinkins's appearance around the time that the crime occurred and to show that he wore clothing similar to that of the man who initially approached M.W., inasmuch as the identification of M.W.'s assailants was a significant issue in this case. Moreover, the witnesses were able to connect Pinkins to the Interlude Motel, from whose parking lot the license plate used on Daniels's car during the attacks had been stolen. The testimony regarding the visits to the Interlude Motel and the Caddy Shack also established that Glenn frequently wore an army fatigue jacket like one of M.W.'s attackers.

In considering the admission of this evidence, it is apparent to us that Pinkins has failed to demonstrate that his decision to patronize strip clubs even constituted "uncharged misconduct" within the meaning of the rule. Therefore, we cannot say that the admission of such evidence constituted such a blatant violation of basic and elementary principles that rendered the trial unfair. As a result, Pinkins's claim of fundamental error must fail.

■ We also reject Pinkins's contention that the admission of this testimony amounted to prosecutorial misconduct. Generally, a claim of prosecutorial misconduct requires a determination that there was misconduct by the prosecutor and that it had a probable persuasive effect on the jury's decision. *Overstreet v. State*, 783 N.E.2d 1140, 1154 (Ind.2003).

Here, it was Pinkins's counsel who elicited testimony that Pinkins would frequent the Caddy Shack with Robinson and that Pinkins became friendly with the bartender and several of the dancers. Tr. p. 2714, 2721. Moreover, defense counsel asked Pinkins's wife if she had an opinion about Pinkins frequenting strip clubs and establishments that were known for prostitution. Tr. p. 2881. His wife also offered that she and Pinkins had a healthy sexual relationship and that Pinkins "gets along fine" with the females in his family. Tr. p. 2948–49. Pinkins acknowledged that while he visited strip clubs on occasion, he and his wife had a healthy sexual relationship. Pinkins also testified that drug use occurred at the Caddy Shack. Tr. p. 3186.

Here, the prosecutor merely explored the testimony that had been offered by Pinkins and various defense witnesses. We therefore find it disingenuous for Pinkins to claim it was prosecutorial misconduct to further that testimony on cross-examination. At no time during the trial did the State suggest that Pinkins was guilty because he frequented the Caddy

Shack and the Interlude Motel. The record simply does not support the claim that the State offered this evidence for an improper purpose. As a result, we must conclude that Pinkins has failed to demonstrate that the admission of this evidence was fundamental error. Similarly, Pinkins has failed to demonstrate that the State's evidence regarding his patronage of the Caddy Shack and the Interlude Motel constituted prosecutorial misconduct.

## II. Arguments on Post–Conviction Relief

Pinkins claims that he is entitled to post-conviction relief because DNA testing that was performed in 2001 constituted newly discovered evidence that entitled him to a new trial. Pinkins also argues that he is entitled to post-conviction relief because his trial counsel was ineffective.

■ In addressing these claims, we first note that a petitioner who has been denied post-conviction relief faces a "rigorous standard of review" on appeal. *Dewitt v. State*, 755 N.E.2d 167, 170 (Ind.2001). The post-conviction court's denial of relief will be affirmed unless the petitioner shows that the evidence "leads unerringly and unmistakably to a decision opposite" that reached by the post-conviction court. *Williams v. State*, 706 N.E.2d 149, 154 (Ind.1999). A post-conviction petitioner has the burden of establishing the grounds for relief by a preponderance of the evidence. *Id.* at 153.

Additionally, a petitioner who has been denied post-conviction relief is in the position of appealing from a negative judgment. *Collier v. State*, 715 N.E.2d 940, 942 (Ind.Ct.App.1999), *trans. denied.* This court accepts the post-conviction court's findings of fact unless they are clearly erroneous. *Bigler v. State*, 732 N.E.2d 191, 194 (Ind.Ct.App.2000), *trans. denied.* We consider only the probative evidence and reasonable inferences therefrom that support the post-conviction court's determination and will not reweigh the evidence or judge the credibility of the witnesses. *Id.*

### A. DNA Testing

■ Pinkins claims that the post-conviction court erred in concluding that DNA testing performed in 2001 did not require a vacation of Pinkins's convictions and sentences. Alternatively, he claims that the test results met the standard for newly discovered evidence that would entitle him to a new trial. In essence, Pinkins maintains that recent technological advances in DNA science have made the 1990 testing obsolete and, therefore, the 2001 testing should have been considered favorable to him.

With regard to this issue, the post-conviction court made the following findings about the 2001 DNA testing that are supported in the record:

Cellmark Diagnostics DNA analyst, Juliette Harris, testified that in 2001, she compared evidence collected in this case with known standards from the petitioner. She explained that the technology she used, Polymerase Chain Reaction (PCR), enables analysts to obtain DNA profiles from smaller samples of genetic material than the technology that was used when the evidence was originally tested in 1990, using the methodology Restriction Fragment Length Polymorphism (RFLP). After testing all samples and comparing those samples with the known standard from the petitioner, Juliette Harris was able to isolate profiles from only two unidentified males and a female believed to be the victim. She was able to excluded (sic) the petitioner's DNA profile from the DNA profiles she had isolated for every sample except one. The DNA sample from which the petitioner could not be exclud-

ed was scientifically insignificant since Juliette Harris could not do a complete comparison on that sample. She concluded that her results were essentially the same as the original 1990 results. Juliette Harris further testified that the DNA results were neutral in that they could neither include nor exclude the petitioner as one of the perpetrators of the assaults on M.W. Juliette Harris also testified that the DNA evidence was neutral, since five men assaulted M.W. and only two DNA profiles in addition to M.W.'s were developed.

Appellant's App. p. 789. Although Pinkins maintains that the DNA testing conducted in 2001 should have been considered favorable to him, Indiana Code section 35–38–7–19 dictates that the results must be favorable—not the fact that the science of the testing has become more advanced. Specifically, the statute provides that a new trial may be ordered "if the *results* of postconviction DNA testing and analysis are favorable to the person who was convicted of the offense." (Emphasis added). If the statute provided otherwise and permitted the scientific procedure alone to satisfy the standard, a DNA scientist could simply testify that a method performed in the original testing had been superseded, and the petitioner could then be afforded a new trial without any additional showing.

As recounted above, Harris testified that the results of the 1990 testing and the 2001 testing were "basically" the same. PCR Tr. p. 200, 217. That is, the DNA tests showed that Pinkins could be neither included nor excluded as one of M.W.'s assailants. That said, Pinkins has failed to demonstrate that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court.

 We also reject Pinkins's contention that the 2001 DNA testing results constituted newly discovered evidence. To prevail on such a claim, a defendant must establish the following requirements: (1) the evidence was not available at trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result. *Godby v. State,* 736 N.E.2d 252, 258 (Ind.2000).

In resolving this claim, we set forth the post-conviction court's findings in addition to those that are quoted above:

> The results of the DNA re-testing done by Cellmark Diagnostics in 2001 fail to meet the standard for newly discovered evidence which would entitle the petitioner to a new trial. Notwithstanding the improved DNA testing procedure which enables analysts to detect DNA profiles from smaller samples of genetic material, the 2001 results are consistent with the 1991 results which were admitted as evidence at the petitioner's trial. It is the result of the DNA testing, not the process used to obtain the result, that is material to the petitioner's guilt or innocence. In both the 1991 and the 2001 tests, only two DNA profiles were isolated in addition to the victim's. Thus, the 2001 results are merely cumulative evidence. Moreover, it cannot be said that production of the 2001 results would probably produce a different verdict. It is undisputed that M.W. was assaulted by five men. Using existing technology, the DNA profiles of the other assailants cannot be isolated. Accordingly, the 2001 results are consistent with the jury's conclusion that the petitioner was one of five men who assaulted M.W. Evidence of two unidenti-

fied DNA profiles cannot exonerate the petitioner.

Appellant's App. p. 793–94.

Pinkins raises the same arguments with respect to newly discovered evidence as he did in the previous claim regarding the subsequent DNA testing. Even if it could be assumed that some of the scientific procedures proffered at the original trial were erroneous, it remains that both the 1990 and 2001 tests revealed that only two of the suspects' DNA profiles were isolated from the physical evidence. Thus, Pinkins has failed to meet the standard of newly discovered evidence, and he has not shown that the post-conviction court's conclusion with regard to the subsequent DNA testing was error.

### B. Ineffective Assistance of Counsel

Pinkins next claims that he is entitled to post-conviction relief because his trial counsel was ineffective. Specifically, Pinkins argues that his trial counsel was ineffective because he fell asleep during the trial and failed to move to suppress a pre-trial identification procedure as well as M.W.'s in-court identification of him. Pinkins also claims that his trial counsel was ineffective for failing to object to his "proclivity to visit strip joints"—an alleged violation of Indiana Rule of Evidence 404(b). Appellant's Br. p. 62.

In resolving these contentions, we note that pursuant to *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a claim of ineffective assistance of counsel requires a showing that: (1) counsel's performance was deficient by falling below an objective standard of reasonableness based on prevailing professional norms; and (2) counsel's performance prejudiced the defendant to the extent that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See French v. State,*

778 N.E.2d 816, 824 (Ind.2002). Failure to satisfy either prong will cause the claim to fail. *Id.* Indeed, ineffective assistance of counsel claims may be resolved by a prejudice inquiry alone. *See id.*

#### 1. Sleeping at Trial

█ Pinkins claims that he is entitled to post-conviction relief because his trial counsel fell asleep during the trial. In essence, Pinkins contends that prejudice was inherent by this episode because "sleeping counsel is equivalent to no counsel at all." Appellant's Br. p. 54.

In addressing this issue, we have found no Indiana case directly on point. However, the U.S. Court of Appeals for the Ninth Circuit has recognized that "when an attorney for a criminal defendant sleeps through a substantial portion of the trial, such conduct is inherently prejudicial and thus no separate showing of prejudice is necessary." *Javor v. United States,* 724 F.2d 831, 833 (9th Cir.1984). In *Javor,* the defense counsel not only slept during the trial, but he also failed to participate when evidence against his client was being presented. *Id.* at 834. Additionally, it was found in *Burdine v. Johnson,* 262 F.3d 336, 349 (5th Cir.2001), that counsel was ineffective when he slept through a portion of a twelve hour and fifty-one minute capital trial. *Id.* at 349. However, the court did not adopt a per se rule and, instead, limited its holding to the "egregious" facts of the case. *Id.*

Here, it was demonstrated that Pinkins's counsel only dozed briefly at the trial during the direct examination of forensic serologist Kimberly Epperson, a witness for the State. To be sure, this momentary lapse during the three-week-long trial was not noticed by anyone in the courtroom, including Pinkins. Moreover, our review of the record shows that Pinkins's counsel explored the substance of

Epperson's direct examination testimony in a thorough cross-examination of her, which is comprised of nearly forty pages of the transcript. Tr. p. 1268–1308. Pinkins does not identify any evidence that should have been objected to, and he does not point to a topic that his defense counsel failed to inquire about on cross-examination. As a result, Pinkins has failed to show that he was prejudiced by the isolated episode of his counsel's dozing, and the post-conviction court properly determined that he was not denied the effective assistance of counsel on this basis.

### 2. Lack of Objection—In-court Identification

■ Pinkins contends that his trial counsel was ineffective for failing to object to evidence regarding a 1991 incident where M.W. was shown a photograph of him prior to her deposition. Pinkins also claims that his trial counsel was ineffective for failing to object to M.W.'s in-court identification of him as one of the assailants. Pinkins maintains that his trial counsel's failure to object was objectively unreasonable and outside the wide range of professionally competent assistance.

When a claim for ineffective assistance of counsel is based on counsel's failure to object, the defendant must show that a proper objection would have been sustained. *Smith v. State*, 765 N.E.2d 578, 585 (Ind.2002). Additionally, a petitioner must demonstrate that a failure to object resulted in prejudice to him. *Timberlake v. State*, 690 N.E.2d 243, 259 (Ind.1997).

Turning to Pinkins's claims, the record shows that M.W. first identified Pinkins as one of her assailants when she voluntarily attended the pretrial court proceedings on May 4, 1990. She then told Detective Solan and the deputy prosecutor that Pinkins had been one of her attackers. Tr. p. 656, 2183–84. During the trial, M.W. identified Pinkins as the man who had original-

ly approached her in the car and also testified that he had been the fourth man that raped her.

On cross-examination, M.W. testified that the day before her deposition took place in 1991, she was shown a photograph of Pinkins for the purpose of discussing facial hair. Tr. p. 609–10. It is apparent that this particular incident that transpired before the deposition did not involve the identification of Pinkins as an assailant. Instead, M.W. was shown a photograph of Pinkins and asked some questions about it. That took place eight months after M.W. had already identified Pinkins as one of her attackers. Therefore, we cannot say that the 1991 incident amounted to an unduly suggestive pre-trial procedure that would warrant a reversal. Accordingly, Pinkins may not succeed with an ineffective assistance of counsel argument on this basis.

■ Moreover, even if it could be said that this alleged identification should have been suppressed, our supreme court has determined that an in-court identification is nonetheless admissible if the witness has an adequate independent basis for the in-court identification. *Logan v. State*, 729 N.E.2d 125, 131 (Ind.2000). When determining the existence of an independent basis, the following circumstances should be considered:

> The amount of time the witness was in the presence of the perpetrator and the amount of attention the witness had focused on him, the distance between the two and the lighting conditions at the time, the witness's capacity for observation and opportunity to perceive particular characteristics of the perpetrator, the lapse of time between the crime and the subsequent identification.

*Id.* at 132.

Here, the evidence revealed, and the post-conviction court found that:

At the time she was abducted, M.W. saw [Pinkins] for approximately five seconds at close range during their struggle. She then watched [Pinkins] get into the passenger side of her car as she was being dragged back to her assailant's car. Moreover, M.W. observed [Pinkins] under the light of the bright beam headlights of the car he had been driving, in an area illuminated by streetlights, and a nearby traffic light.

Appellant's App. p. 792. M.W. had also identified Pinkins as one of the perpetrators five months after the attack in a situation that was not unduly suggestive or conducive to irreparable mistaken identification. Therefore, this prior identification demonstrates that M.W. had an independent basis to recognize Pinkins as one of her attackers apart from being shown his photograph just before her deposition in 1991. As a result, an objection to the in-court identification would not have been sustained, and Pinkins's trial counsel was not ineffective for failing to object.

### 3. Lack of Objection—Pinkins's Patronage of Bars

Finally, Pinkins claims that his trial counsel was ineffective for failing to object to the testimony regarding Pinkins's propensity to patronize strip clubs. Specifically, Pinkins urges that this evidence was presented only to establish his sexual proclivities and that his trial counsel had no strategic reason for failing to object to this evidence.

As set forth above, such evidence was introduced to show the type of clothing that Pinkins typically wore, and that he was wearing similar clothing when he approached M.W. at the time of the attack. This evidence also showed that Glenn, who often accompanied Pinkins to these clubs, wore fatigue jackets like one of M.W.'s other attackers. Even more compelling,

the evidence was offered in an effort to connect Pinkins to the motel where the license plate had been stolen. It was revealed at the post-conviction hearing that a substantial portion of defense counsel's strategy was to allow the admission of all of the evidence at trial in an effort to show the jury that Pinkins had nothing to hide. PCR Tr. p. 539. During counsel's closing argument at trial, he announced that:

> [W]e didn't try to keep a damn piece of evidence out of this case because my theory, as expressed to my client, and our strategy in this case was open the doors, open the windows, let it all come in, let the light shine in, let all the facts get in, let all the allegations in, because there's not a damn thing to hide here. And if he was guilty—if he thought he was guilty, if he knew he was guilty, that would not have been our strategy.

Tr. p. 3526–27. As indicated above, with the assent of Pinkins, his trial counsel's strategy was to allow evidence in at trial to show that there was nothing to hide. In our view, given the circumstantial nature of this case, the strategy was sound. Therefore, Pinkins has failed to demonstrate that his counsel's decision not to object to the evidence of his propensity to visit strip bars amounted to deficient performance. Moreover, Pinkins cannot show that the objection would have been sustained had one been made because such evidence did not amount to uncharged crimes or prior bad acts that might have rendered the admission of such evidence inadmissible. As a result, Pinkins cannot succeed upon his claim that his trial counsel was ineffective.

### CONCLUSION

In light of our disposition of the issues set forth above, we conclude that permitting Arvin to testify as an expert witness did not amount to reversible error and that the instruction on accessory liability

was not fundamental error. We also note that the trial court did not err in admitting the evidence regarding Pinkins's propensity to patronize strip clubs and that the DNA testing performed in 2001 did not constitute newly discovered evidence that entitled Pinkins to a reversal. Finally, we conclude that Pinkins did not receive the ineffective assistance of counsel.

We affirm the judgments of the trial court and the post-conviction court.

BROOK, C.J., and SHARPNACK, J., concur.