# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 18 2018, 9:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Anne Murray Burgess
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Joshua D. Preston, <br> *Appellant-Petitioner,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Respondent.* | July 18, 2018 <br><br> Court of Appeals Case No. 35A04-1711-PC-2727 <br><br> Appeal from the Huntington Circuit Court <br><br> The Honorable Thomas Hakes, Judge. <br><br> Trial Court Cause No. 35C01-1303-PC-3 |

**Kirsch, Judge.**

[1] After his convictions for neglect of a dependent and battery were affirmed on direct appeal, Joshua D. Preston ("Preston") filed a petition for post-conviction relief, which the post-conviction court denied. Preston now appeals and raises the following restated issues:

> I. Whether the post-conviction court erred when it found that his trial counsel did not provide ineffective assistance when counsel did not hire an expert to support Preston's version of events, that N.B. sustained accidental impact injury; and

> II. Whether the post-conviction court erred when it found that studies published since 2012, which assisted Preston's expert in forming his opinions, did not constitute newly discovered evidence.

[2] We affirm.

## Facts and Procedural History

[3] The facts supporting Preston's convictions as set forth by this court on his direct appeal are as follows:

> In early August 2010, Preston was babysitting N.B., the eight-month-old child of his girlfriend, Michelle Bowling ("Bowling"). Preston told Bowling that N.B. had fallen off his lap and hit her head on a television stand. Bowling observed a rug burn on N.B.'s head and some bruising across her ear. Around this same time, Bowling also observed that N.B. had stopped crawling. Bowling took N.B. to the hospital and the doctor informed her that N.B. had stopped crawling due to the ear infection she was experiencing at the time, because it was affecting her equilibrium.

In early September 2010, Preston was experiencing withdrawal from the methadone pills that he had previously been using without a prescription. Therefore, from September 4-6, 2010, he was too sick to help Bowling move into their home, and she testified that he was irritable and grouchy during that period of withdrawal.

On September 7, 2010, Bowling left N.B. with Preston while she went to the store, even though Preston still looked pale and had vomited earlier that day. While Bowling was away, Preston called her and told her that N.B. had fallen off the couch and was crying uncontrollably, but he then called Bowling back to tell her N.B. was doing better. However, for several hours after Bowling's return, N.B. was vomiting and lethargic. Later that night, Bowling called the doctor. The nurse advised Bowling to continue to monitor N.B. and to take her to the hospital if the vomiting did not cease.

Bowling suggested to Preston that they should take N.B. to the hospital but Preston told Bowling not to take N.B. because he would be accused of child abuse. *Tr.* at 463. Nonetheless, Bowling, on her own, took N.B. to Parkview Huntington Emergency Room. Bowling relayed to the emergency room doctors Preston's story that N.B. had fallen off the couch, and after performing a CT scan, doctors released N.B. and told Bowling to give N.B. Tylenol and to put ice on her head. During the day on September 8, 2010, N.B. appeared lethargic, was still throwing up, and would not eat. *Tr.* at 467. As the day progressed, N.B. seemed to improve.

On September 9, 2010, N.B. seemed to be doing better. Bowling left N.B. with Preston while she went with her stepsister to apply for a new job. While Bowling was away, Preston called Bowling's stepsister's phone and was screaming N.B.'s name repeatedly, but Bowling and her stepsister could not discern what was wrong. Preston then ran out onto his porch holding N.B.

and shouting N.B.'s name. A stranger passing by, Andrew Delagrange ("Delagrange") saw Preston out on his porch, holding N.B. Delagrange asked if he could help, and he told Preston to call 911. When the paramedics arrived at the home, nine-month-old N.B. was pale, unresponsive to stimuli, her eyes were wide open with no pupillary response, and she was having irregular and shallow breathing. *State's Ex.* 2. They also observed a dime sized greenish bruise on her right forehead and blood in her nose. Preston told the paramedics that N.B. had rolled off the couch and was unresponsive.

N.B. was flown by helicopter to Parkview Hospital in Fort Wayne. Dr. Jayesh Patel ("Dr. Patel"), medical director of the pediatric intensive care unit, initially diagnosed N.B. with a significant cerebral concussion. After more tests and consultation with other doctors, he concluded N.B.'s symptoms were not consistent with a fall off a couch and he diagnosed her with "shaken baby syndrome[.]" *Tr.* at 391, 393. Dr. Jeffrey Bessette ("Dr. Bessette"), a diagnostic radiologist, conducted a CT scan and a MRI scan of N.B.'s brain and observed a subdural hematoma. He also reviewed the CT scan from September 7, 2010 and discovered that the subdural hematoma was already present on that day. He also observed a fracture on N.B.'s right radius from an injury sustained four to eight weeks prior. Dr. Barbara Schroeder ("Dr. Schroeder"), an ophthalmologist, also examined N.B. and noted that N.B.'s eyes showed massive preretinal and intraretinal hemorrhages, which she noted was "consistent only with non-accidental shaking trauma." *State's Ex.* 9.

Detective Cory Boxell ("Detective Boxell") questioned Preston regarding the injuries to N.B. Preston told Detective Boxell that he was the sole adult present when N.B. fell off the couch on September 7, 2010 and that N.B. had slept most of the day on September 8, 2010. Preston also said he was the only adult present with N.B. on September 9, 2010 when, according to him,

N.B. again fell off the couch, due to his son pulling the blanket N.B. was wrapped up in at the time.

Preston was charged with Class B felony neglect of a dependent resulting in serious bodily injury between August 1, 2010 until September 9, 2010 and was charged with Class B felony battery resulting in serious bodily injury to a person less than fourteen years of age and committed by a person of at least eighteen years of age between September 7, 2010 until September 9, 2010.

On February 27, 2012, the jury trial commenced and continued until March 1, 2012. During the trial, three physicians testified that N.B.'s condition was the result of abusive head trauma. On March 2, 2012, the jury found Preston guilty on both counts. On May 7, 2012, Preston was sentenced to consecutive eighteen-year sentences, with three years suspended to probation on each count. *Preston v. State*, No. 35A04-1206-CR-291, slip op. at *3-4 (Ind. Ct. App. Feb. 6, 2013).

[4] Preston appealed, arguing errors in the admission of evidence and claiming that his convictions violated Indiana double-jeopardy provisions. A panel of this court unanimously affirmed his convictions and sentences. Preston later filed a petition for post-conviction relief, which he amended to allege ineffective assistance of trial counsel. *PCR App.* at 69-71; *PCR Tr. Vol. II* at 3.

[5] The post-conviction court conducted an evidentiary hearing on the amended petition on August 2, 2017. *PCR Tr. Vol. II* at 3. At the hearing, Preston introduced the deposition of trial counsel, Matthew Grantham ("Grantham) in lieu of his live testimony. *Id.* at 4; *PCR Ex.* 5 & 5A. Preston also presented testimony from Dr. John Galaznik ("Dr. Galaznik"), a physician who had been

employed for thirty-seven years treating "active, vigorous college students" at the University of Alabama Tuscaloosa. *PCR Tr. Vol. II* at 15. During that employment, Dr. Galaznik had never treated a younger child, or an infant, for suspected abuse, abusive head trauma, or significant eye trauma. *Id*. at 25-27, 29, 30.

[6] Dr. Galaznik was familiar with terms from ophthalmology and neurology and explained he approached these disciplines by reading reports and seeing "if just self-learning can match it, uh, against what I see in the imaging . . . I'm fairly, I think, familiar with the terms and what's being discussed on everything in the reports." *Id*. at 18. Dr. Galaznik was aware that the American Academy of Pediatrics had issued a policy statement that expert witnesses should be board certified in the relevant specialty of their testimony, as well as actively and meaningfully engaged in clinical practice in that area, but noted that policy statement was issued after he had begun his "work." *Id*. at 33, 41.

[7] Dr. Galaznik was given one of Preston's accounts of the injury, that N.B. had fallen from the couch, and said it was possible that a fall from the couch on September 7, 2010 could have produced her symptoms, either alone or in conjunction with the second alleged fall on September 9, 2010. *Id*. at 70-75. He also testified that it was also possible that the alleged fall on September 7, 2010, could have produced the seizures observed for N.B. on September 9, 2010. *Id*. at 70-75. Dr. Galaznik also said it was possible that an impact injury could rapidly increase intracranial pressure, citing "experimental research in an animal model where they took and impacted the head of a sheep model" before

testing its intracranial pressure. *Id*. at 59-60. The research, he said, suggested that an impact injury can produce a dramatic increase in intracranial pressure within a short time. *Id*. at 60. He also thought this pressure could produce retinal hemorrhaging. *Id*. at 80-81, 87.

[8] Dr. Galaznik had read a 2010 study conducted on piglets whose heads were attached to a jackhammer and accelerated and decelerated through a 110-degree arc in less than 15/1000ths of a second. *Id*. at 83. The authors of the study had "rushed over and looked" at the piglets' eyes and did not see "grossly visible retinal findings." *Id*. at 83. Dissection of the piglets found varying percentages which had sustained hemorrhaging behind the iris or pooling of blood in front of the iris, but Dr. Galaznik said these areas were not those associated with retinal hemorrhaging in human eyes. *Id*. at 85). Dr. Galaznik also briefly cited another study done using rotational motion with lambs' heads. *Id*. at 86. The lambs had been anesthetized, and a number of smaller lambs had died from the experiment within several hours. *Id*. at 164; *PCR Ex*. E).

[9] The post-conviction court also heard from Dr. Ralph Hicks ("Dr. Hicks") who testified for the State, as he had at Preston's trial, that the conclusion of abusive head trauma was supported by a thorough examination of N.B.'s condition and symptoms. *PCR Tr. Vol. II* at 160-62, 168, 180. He testified that some medical professionals believe shaking alone can produce head trauma, while others do not, and that a simple choice between one cause or the other was difficult to make. *Id*. at 159. Dr. Hicks explained that, while the precise mechanism of shaking is not fully understood, the prevailing theory in the medical community

is that shaking produces forceful acceleration, deceleration, and rotation that damages the brain. *Id*. at 182. He also noted that "the majority of infants and children who have abusive head trauma will have retinal hemorrhages to one degree or another" and that the massive or severe retinal hemorrhaging found by Dr. Schroeder is "very highly associated with inflicted head trauma." *Id*. at 160-62, 182. Dr. Hicks was skeptical of studies involving animals because "we know there are differences between different animal models and a living human infant, uh, but I don't think we fully understand what those differences might be and how they might relate to whether injury occurs or does not." *Id*. at 164-65.

[10] Dr. Hicks also disagreed with the assertion that N.B.'s subdural hematoma could have existed from birth. *Id*. at 168. Subdural hematomas found at birth generally occur lower in the brain, near the cerebellum, than the subdural hematoma found in N.B., which was near the top of her head. *Id*. at 169. After the conclusion of the evidence, the post-conviction court issued an order denying Preston's petition. The court found that Preston did not receive ineffective assistance of counsel. Preston now appeals.

## Discussion and Decision

[11] Post-conviction proceedings do not afford the petitioner an opportunity for a super appeal, but rather, provide the opportunity to raise issues that were unknown or unavailable at the time of the original trial or the direct appeal. *Ben-Yisrayl v. State*, 738 N.E.2d 253, 258 (Ind. 2000), *cert. denied,* 534 U.S. 1164 (2002); *Wieland v. State*, 848 N.E.2d 679, 681 (Ind. Ct. App. 2006), *trans. denied*,

*cert. denied,* 549 U.S. 1038 (2006). The proceedings do not substitute for a direct appeal and provide only a narrow remedy for subsequent collateral challenges to convictions. *Ben-Yisrayl*, 738 N.E.2d at 258. The petitioner for post-conviction relief bears the burden of proving the grounds by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5).

[12] When a petitioner appeals a denial of post-conviction relief, he appeals a negative judgment. *Fisher v. State*, 878 N.E.2d 457, 463 (Ind. Ct. App. 2007), *trans. denied*. The petitioner must establish that the evidence as a whole unmistakably and unerringly leads to a conclusion contrary to that of the post-conviction court. *Id*. We will disturb a post-conviction court's decision as being contrary to law only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion. *Wright v. State*, 881 N.E.2d 1018, 1022 (Ind. Ct. App. 2008), *trans. denied*. The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Lindsey v. State*, 888 N.E.2d 319, 322 (Ind. Ct. App. 2008), *trans. denied*. We accept the post-conviction court's findings of fact unless they are clearly erroneous, and no deference is given to its conclusions of law. *Fisher*, 878 N.E.2d at 463.

## I. Ineffective Assistance of Counsel

[13] Preston argues that the post-conviction court erred in denying his petition for post-conviction relief because he received ineffective assistance from his trial attorney. When evaluating a claim of ineffective assistance of counsel, we

apply the two-part test articulated in *Strickland v. Washington,* 466 U.S. 668 (1984). *Perry v. State*, 904 N.E.2d 302, 308 (Ind. Ct. App. 2009) (citing *Pinkins v. State,* 799 N.E.2d 1079, 1093 (Ind. Ct. App. 2003), *trans. denied*), *trans. denied*. First, the defendant must show that counsel's performance was deficient. *Id.* This requires a showing that counsel's representation fell below an objective standard of reasonableness and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed to the defendant by the Sixth and Fourteenth Amendments to the United States Constitution. *Id.* Second, the defendant must show that the deficient performance resulted in prejudice. *Id.* To establish prejudice, a defendant must show that there is a reasonable probability that but for counsel's unprofessional errors; the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

[14] Further, counsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption. *Williams v. State*, 771 N.E.2d 70, 73 (Ind. 2002). We will not lightly speculate as to what may or may not have been an advantageous trial strategy, as counsel should be given deference in choosing a trial strategy that, at the time and under the circumstances, seems best. *Perry*, 904 N.E.2d at 308 (citing *Whitener v. State,* 696 N.E.2d 40, 42 (Ind. 1998)). Isolated omissions or errors, poor strategy, or bad tactics do not necessarily render representation ineffective. *Shanabarger v. State*, 846 N.E.2d 702, 708 (Ind. Ct. App. 2006), *trans. denied*. The two prongs of the *Strickland* test are separate and independent inquiries. *Manzano v. State*,

12 N.E.3d 321, 325 (Ind. Ct. App. 2014), *trans. denied*, *cert. denied*, 135 S. Ct. 2376 (2015). "Thus, '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'" *Id.* (quoting *Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001), *cert. denied*, 537 U.S. 839 (2002)).

[15] Preston first contends that his trial counsel deficiently performed by formulating a defense without the aid of an expert. Preston asserts that this failure precluded a defense that N.B.'s injuries were consistent with the accidental falls occurring while she was in his care, as described by Preston. Preston argues that the State's argument, that N.B.'s injuries had to be intentionally inflicted because she had been shaken, was left unchecked. We disagree.

[16] Grantham's decision to formulate a defense without the aid of an expert did not constitute deficient performance. Grantham testified in his deposition that his defense strategy was to try to show N.B. had not been abused and that Preston's version of events created reasonable doubt. Moreover, Grantham testified that his argument was that if N.B. had been abused, it was not by Preston. In preparation for trial, Grantham testified that he reviewed documents provided by the State in discovery and consulted with his wife's brother-in-law, who was in medical school at the time, and his father-in-law, who was a general practice physician. Grantham stated that he also reviewed an abusive head trauma article that his wife's brother-in-law forwarded to him. Grantham stated that his decision not to consult an expert was because he believed his best strategy was to focus on the lack of evidence that his client was the perpetrator, and he believed he could dispute the

medical evidence on cross-examination. The trial record reflects that Grantham cross-examined every witness and attempted to establish Preston's defense that no one saw Preston injure N.B. and that some of the medical issues N.B. displayed, such as retinal hemorrhaging and a subdural hematoma, could have been caused by something other than child abuse. Because Grantham adequately prepared for trial and developed a trial strategy that he believed was best for Preston's case, his performance was not deficient.

[17] Additionally, Preston argues that he was prejudiced by his trial counsel's failure to hire an expert, and there is a reasonable probability that had he done so, the outcome of Preston's trial would have been different. "While it is undisputed that effective representation requires adequate pretrial investigation and preparation, it is well settled that we should resist judging an attorney's performance with the benefit of hindsight." *McKnight v. State*, 1 N.E.3d 193, 200 (Ind. Ct. App. 2013). Therefore, when deciding a claim of ineffective assistance for failure to investigate, we apply a great deal of deference to counsel's judgments. *Id.* at 201. Establishing failure to investigate as a ground for ineffective assistance of counsel requires going beyond the trial record to show what investigation, if undertaken, would have produced. *Woods v. State,* 701 N.E.2d 1208, 1214 (Ind. 1998), *cert. denied*, 550 U.S. 930 (1999). This is necessary because success on the prejudice prong of an ineffectiveness claim requires a showing of a reasonable probability of affecting the result. *McKnight*, 1 N.E.3d at 201. Here, Preston's arguments amount to the contention that, if

Grantham had called an expert, there is a reasonable probability the outcome of his case would have been different. We disagree.

[18] The trial record reflects testimony from multiple medical professionals who all agreed that N.B.'s injuries were not consistent with a fall from a couch as Preston had alleged. Katrina Adelman ("Adelman"), Emergency Medical Technician Paramedic, testified that she "saw what we call decorticate where she's pulling her extremities in and then decerebrate posturing which is pushing them out which is really indicative of a head injury." Adelman also stated that this type of posturing is not seen normally when a child falls from a couch.

[19] Dr. Schroeder testified that N.B. had a lot of retinal hemorrhaging which was consistent with non-accidental shaking trauma. N.B. also had a subdural hematoma and subdural hemorrhaging which were consistent with findings about abusive head trauma. Dr. Schroeder indicated that N.B.'s retinal hemorrhaging was massive; "N.B. had bilateral, severe, retinal hemorrhages consistent with non-accidental shaking trauma." Dr. Schroeder stated "Retinal hemorrhages like this are not found in any other condition except for shaking injury. There's just nothing else that causes retinal hemorrhages like that." Dr. Bessette testified that it was unusual for a nine-month-old child to have a subdural hematoma. Dr. Bessette also stated that he has never seen a child receive a subdural hematoma from a nineteen-inch fall from a couch. Dr. Patel testified that N.B.'s seizures, subdural hemorrhaging, retinal hemorrhaging, vomiting, subdural hematoma, unresponsiveness, and gasping respiration following the incident, and N.B.'s loss of vision over a period of time were all

consistent with the abusive head trauma diagnosis. Dr. Patel stated that a short fall from the couch, as Preston alleged, would not explain N.B.'s injuries.

[20] Dr. Hicks testified that N.B.'s altered level of consciousness, including unresponsiveness and seizure-like activity, the bruises on her forehead, left arm, and shoulder area, the collection of hemorrhage or blood underneath the dural membrane that covers the brain and underneath the skull, the extensive retinal hemorrhaging were all consistent with the findings of abusive head trauma. Dr. Hicks also indicated that a fall from a couch nineteen inches high off the ground was not consistent with an abusive head trauma finding because of the type of injuries N.B. had and the severity of the injuries were not the sort of things you would expect to see from a fall of this height even on a hardwood floor. Dr. Hicks stated, "We just don't see life threatening injuries in otherwise healthy children from those types of falls."

[21] A significant and consistent amount of evidence was presented to display that N.B.'s combined injuries could not have been caused by anything other than non-accidental trauma. Because Preston is unable to show a reasonable probability that, but for Grantham's decision not to hire an expert, the result of his criminal proceeding would have been different, Preston was not prejudiced. We find that Preston has failed to show that "the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court." *Kubsch v. State*, 934 N.E.2d 1138, 1144 (Ind. 2010).

## II. Newly Discovered Evidence

[22] Preston argues that the State's medical conclusions about abusive head trauma and the causal relationship to retinal hemorrhaging have been undermined by recent studies that were published since Preston's trial. Newly discovered evidence mandates a new trial only when a defendant demonstrates that: (1) the evidence has been discovered since trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) it is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at trial. *Whedon v. State*, 900 N.E.2d 498, 504 (Ind. Ct. App. 2009) (citing *Taylor v. State,* 840 N.E.2d 324, 329-30 (Ind. 2006)), *summarily aff'd*, 905 N.E.2d 408 (Ind. 2009). "We 'analyze[ ] these nine factors with care, as the basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized.'" *Id.* The petitioner for post-conviction relief bears the burden of showing that *all* nine requirements are met. *Id.* (emphasis in original).

[23] Preston contends that the new evidence is material, relevant, and not cumulative because it negates the State's theory that N.B.'s injuries could have only been caused by shaking. He also claims that the newly discovered evidence is not privileged or incompetent, is worthy of credit, and can be produced upon a retrial. Preston alleges that the newly discovered evidence is not merely impeaching because the information from the newest studies provides an independent basis for a defense that N.B.'s injuries were consistent

with Preston's description of the falls. Preston further contends that the evidence could not have been discovered with due diligence; the evidence is worthy of credit; the new evidence will probably produce a different result at trial because it opens up the possibility that N.B.'s injuries were consistent with an accidental fall as described by Preston.

[24] In order to establish that newly discovered evidence warrants a new trial, a petitioner for post-conviction relief must show that *all* nine requirements are met. *Whedon*, 900 N.E.2d at 504. Here, the alleged newly discovered evidence are studies that Preston believes undermines the State's medical conclusions that there is a causal relationship between abusive head trauma and retinal hemorrhaging. Such evidence would have been merely impeaching. In order to merit a new trial, the evidence at issue cannot be merely impeaching. *Id.*

[25] However, evidence that destroys or obliterates the testimony upon which a conviction was obtained is not appropriately considered as merely impeaching evidence. *Bunch v. State*, 964 N.E.2d 274, 291 (Ind. Ct. App. 2012) (citing *Wilson v. State*, 677 N.E.2d 586, 588 (Ind. Ct. App. 1997)) (quotations omitted), *trans. denied*. In *Bunch*, the newly discovered evidence consisted of testimony that the defendant did not set multiple incendiary fires in the mobile home and offered a new, exculpatory explanation for the victim's death. 964 N.E.2d at 291. In *Wilson*, one of the State's witnesses recanted testimony that he and two children saw the defendant point a firearm at the victim and gave an affidavit, in which he stated that he and the children were not in a position to see the incident, and their testimony was fabricated. 677 N.E.2d at 588. In both of

these cases, the newly discovered evidence was found to warrant a new trial because it was not merely impeaching, but instead, destroyed or obliterated the testimony upon which the convictions were obtained.

[26] Such is not the case here. The evidence presented by Dr. Galaznik at the post-conviction hearing does not destroy or obliterate the testimony upon which Preston's convictions were obtained. Dr. Galaznik testified that recent studies failed to establish a causal relationship between retinal hemorrhaging and abusive head trauma; however, Dr. Galaznik also conceded that N.B.'s injuries could have been a non-accidental injury, which is what the jury concluded. Furthermore, the studies that Dr. Galaznik referred to in his testimony were studies regarding animals, not humans. The studies also did not consider all of N.B.'s combined injuries. The evidence that recent studies failed to establish a causal relationship between abusive head trauma and retinal hemorrhaging was merely impeaching, and we, therefore, conclude a new trial was not warranted. The post-conviction court did not err in denying Preston's petition on this issue.

Affirmed.

Baker, J., and Bradford, J., concur.