**Joseph D. CARON, Appellant– Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 20A03–0406–CR–280.**

Court of Appeals of Indiana.

March 31, 2005.

Transfer Denied May 20, 2005.

Nancy A. McCaslin, McCaslin & McCaslin, Elkhart, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Maureen Ann Bartolo, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

FRIEDLANDER, Judge.

Joseph D. Caron appeals his convictions for two counts of Dealing in Methamphetamine in Excess of Three Grams,[1] a class A felony. The first dealing charge was for possession of methamphetamine in excess of three grams with intent to deliver (possession offense), and the second was for manufacturing methamphetamine in excess of three grams (manufacturing offense). Caron presents the following restated issues for review:

1. Did alleged juror misconduct amount to fundamental error?

2. Are Caron's two convictions for dealing in methamphetamine violative of the double jeopardy clause of the Indiana Constitution?

3. Did the trial court improperly sentence Caron based upon aggravating factors not found by a jury?

We affirm in part and reverse in part.

In the late morning of July 21, 2003, a woman drove Robert Storey and Joseph Caron to the edge of a cornfield in Elkhart County. The two went into the field and began manufacturing methamphetamine. Caron, who assisted in the production and acted as a lookout, did this in order to pay off a debt he owed to Storey. The men left the field (*i.e.*, their methamphetamine lab) early in the afternoon and went back to Storey's home in Millersburg so that Caron could pick up his girlfriend from work. Thereafter, Caron returned to Sto-

---

1. Ind.Code Ann. § 35–48–4–1(West 2004).

rey's home, where another woman drove them in a maroon car back to the field later that afternoon. The two went back to the same spot in the field, and the manufacturing process continued.

Area residents had noticed the men earlier in the day and alerted Glen Graber, the owner of the field. Graber, his son, and a neighbor went to the field to investigate. The men observed two sets of fresh footprints and a tank, later found to contain anhydrous ammonia. Soon thereafter, the men observed a maroon car in the area, which they followed into Millersburg before deciding to return to the field. While en route, they called the Elkhart County Sheriff's Department and Eugene Moser, another neighbor. Moser met Graber and the other men at the edge of the field while they waited for officers to arrive.

About ten minutes later, Storey emerged from the cornfield and was startled at the sight of the men. Storey explained that he was looking for his dog and then walked toward an adjacent railroad. When Graber's son followed, Storey ran and hid in some tall grass. Deputy Sheriff Jason Reaves arrived on the scene and quickly apprehended Storey.

In the meantime, Deputy Sheriff James Snyder began to investigate further. He discovered several items indicating that methamphetamine had been or was being manufactured in the field. Upon further information, Deputy Snyder encountered Caron walking about a half mile away from the field. Caron appeared nervous, sweaty, and covered in mud. He initially told Deputy Snyder that he had been riding a four-wheeler that had gotten stuck. Later that night, however, Caron provided an incriminating statement at the jail, admit-

ting to assisting Storey while Storey "was trying to make some kind of drug" in the field that day. *Exhibit Book* at State's Exhibit 16A.

The Indiana State Police Clandestine Laboratory Team (the Team) was called to the scene. The Team found substantial evidence of an active methamphetamine lab in the field. There was evidence of a batch in process and a finished amount of methamphetamine. The Team recovered 22.69 grams of finished methamphetamine.

Following a three-day jury trial, Caron was convicted as charged as set forth above. Thereafter, the trial court sentenced Caron to concurrent sentences of thirty-five years on each count. Caron now appeals. Additional facts will be presented as necessary.

1.

Caron initially argues that fundamental error occurred when the trial court failed to determine whether juror bias denied him a fair trial. In particular, Caron asserts juror Bonnie Christner (Juror Christner) was a prior acquaintance of his and should not have been on the jury, as she did not indicate her relationship with Caron when the prospective jurors were asked during *voir dire* if they knew Caron or any other trial participant.[2]

The day before Caron's sentencing hearing, two unsworn letters were filed with the court. Peggy Caron, Caron's former wife, wrote the trial court on Caron's behalf and, among other things, informed the court: "When I was married to Joe, we knew and associated with Bonnie Christner. She used to come to our home in Wawaka back into the 1980's." *Appendix* at 115. The other letter, which was signed

**2.** Prospective jurors were asked on two occasions if they knew Caron, to which no affirmative responses were given.

by Caron's aunt and grandmother, stated in relevant part:

> After the trial we found out who one of the jurors were [sic], Bonnie Christner. She used to go to Joe and his ex-wife's house in Wawaka to cut their hair. She used to be a beautician and still might be. She didn't like Joe very much. I thought the jurors were asked if they knew the person on trial. I don't think she should have been on the jury.

*Id.* at 117. At the sentencing hearing, defense counsel made note of one of these letters [3] "for the record." *Id.* at 162. After indicating that it might be necessary to deal with the issue on appeal or in a motion to correct error,[4] defense counsel immediately proceeded with argument related to sentencing matters. Thereafter, Caron addressed this matter during his sentencing testimony as follows:

> [Caron]: There was one woman on the jury that's associated with our family. She has cut my hair in her beauty salon. I did not recognize her. I knew she looked familiar, but I couldn't put my finger on it. I couldn't figure it out. And she had a beauty salon in Millersburg. She has cut my hair. She has trimmed my daughter's hair. She has trimmed my wife's hair.
>
> She has came [sic] to our house at different times with her at-the-time boyfriend. There was trouble at our house once. I tried to knock a window out of her car as she was leaving, and I did not realize that was her on the jury.
>
> [The Court]: You tried to knock a window out of her car.
>
> [Caron]: Yes, sir. At my house. She's been to our house numerous different times with her boyfriend.
>
> [The Court]: And how many times has she cut your hair?
>
> [Caron]: Once I know of, yes. I'm not sure if she trimmed it after that. I don't remember.
>
> [The Court]: Is there anything else you would like to say?
>
> [Caron]: No, sir.

*Id.* at 168–69. The trial court then proceeded to announce Caron's sentence.

 On appeal, Caron couches his argument in terms of fundamental error because he failed to properly preserve the

---

**3.** Defense counsel referred to only one letter at the hearing. While it appears counsel was referring to the letter from Caron's aunt and grandmother, this is not entirely clear from our review of the record.

**4.** The following colloquy occurred between defense counsel and the court, after the court indicated it had not seen such a letter:

> [Counsel]: It is contained in my office, your Honor. I thought I saw it was sent to the Court as well too; however, the person that sent me that letter is here in court today. I at least want to note that for the record. I realize that, that may be an appellate issue concerning some issues related to whether or not members of the jury had any in particular knowledge of the parties involved in the case.

> I know that that was one of the questions that was asked by the Court, and that particular person on the jury indicated no such knowledge. I at least want to note that on the record.
>
> [The Court]: Well, I have no such information, so what you've stated is on the record. So whatever you want to do, go ahead and do.
>
> [Counsel]: I understand that, that may be necessary to be dealt with in the motion to correct error so would ask that—obviously, at the end of this, appellate counsel's going to need to be appointed, but I would note that for the record.

*Id.*

issue below.[5] *See Hornbostel v. State*, 757 N.E.2d 170 (Ind.Ct.App.2001) (failure to object at trial results in waiver of the issue on appeal unless appellant can establish fundamental error), *trans. denied.* The fundamental error exception to the waiver rule is an extremely narrow one. *Glotzbach v. State*, 783 N.E.2d 1221 (Ind.Ct. App.2003). To rise to the level of fundamental error, the error must be so prejudicial to the rights of the defendant as to make a fair trial impossible. *Id.* This exception permits reversal only when there has been a blatant violation of basic principles that denies a defendant fundamental due process. *Pinkins v. State*, 799 N.E.2d 1079 (Ind.Ct.App.2003), *trans. denied.* When raising an issue as fundamental error, the defendant bears the burden of proving that such a violation occurred, which rendered the trial unfair. *Id.* In determining whether an alleged error rendered a trial unfair, we must consider whether the resulting harm or potential for harm is substantial. *Myers v. State*, 718 N.E.2d 783 (Ind.Ct.App.1999). We look to the totality of the circumstances and decide whether the error had a substantial influence upon the outcome. *Id.*

■■■ As Caron correctly observes, proof that a juror lied on *voir dire* generally entitles the defendant to a new trial. *See Lopez v. State*, 527 N.E.2d 1119 (Ind. 1988); *see also Dickenson v. State*, 732 N.E.2d 238, 241 (Ind.Ct.App.2000) ("[i]t is misconduct for a juror to make false statements in response to questions on *voir dire* examination, and such is held to con-

stitute reversible error because it impairs the right to challenge the juror, either peremptorily or for cause"). A defendant seeking a hearing on juror misconduct must initially present some specific, substantial evidence showing a juror was possibly biased. *Dickenson v. State*, 732 N.E.2d 238. In order for juror misconduct to warrant a new trial, the defendant must show that the misconduct was gross and that it probably harmed the defendant. *Carr v. State*, 728 N.E.2d 125 (Ind.2000).

■■ Caron impliedly asserts that his family's letters to the trial court, which were unsworn statements, and his scant testimony during sentencing should serve as substantial proof that Juror Christner lied on *voir dire.* On the record before us, we cannot agree that Caron has established fundamental error in this regard. Rather, we find it unlikely that Juror Christner provided dishonest answers on *voir dire.* Of particular note, Caron's own testimony at the sentencing hearing reveals he did not even recall his prior encounters with Juror Christner until after the guilty verdict had been entered against him following a three-day trial. Moreover, the alleged encounters were few in number, limited in nature, and many years earlier. Caron's eleventh-hour, vague recollection of Juror Christner does not establish specific, substantial evidence that Juror Christner lied on *voir dire.*

Furthermore, our review of the transcript of *voir dire* reveals Juror Christner was forthcoming in her responses. She was questioned individually and as a mem-

---

5. A party has a duty and responsibility, upon the discovery of possible juror misconduct, to formally raise the issue with the trial court in a timely manner. *Terrell v. State*, 745 N.E.2d 219 (Ind.2001). "Thus, when the new evidence is discovered while a matter is still pending in a trial court, it is proper for a party to raise any allegation of error arising therefrom in a motion to the court." *Id.* at

221. Here, because the evidence was known while the case was still before the trial court, Caron should have raised the issue by motion to the trial court (*i.e.,* motion to set aside verdict and for mistrial alleging juror misconduct). *See Terrell v. State*, 745 N.E.2d 219. Caron made no motion to the trial court regarding juror misconduct.

ber of the group. When prospective jurors were asked if any of them had had somebody in the family or a close friend affected by illegal drugs, Juror Christner immediately identified herself and stated, "I'm kind of·not sure." *Appendix* at 184. The following discussion then occurred between the State and Juror Christner:

[State]: Pardon?

[Juror]: I'm kind of not sure.

[State]: All right.

[Juror]: If it would count for sure.

[State]: Okay. Let me ask you, Ms. Christner, what sort of situation was—

[Juror]: It was prescription pills, is that—cause it was pain killers and they got hooked on the paid [sic] killers.

[State]: Was this somebody close to you?

[Juror]: No, it was just a friend. An acquaintance through work.

[State]: Okay. And, does that experience with somebody—well, pain killers is not a illegal narcotic drug like methamphetamine is. . But, having had that experience with somebody, do you think that you could be a fair juror in a case that's about drugs? About illegal drugs?

[Juror]: Yes.

*Id.* at 184–85. This excerpt is an example of Juror Christner's candor and sincere attempt to fully and accurately respond to questions during *voir dire.* Further, defense counsel directly asked Juror Christner if she had a problem with the· presumption of innocence, and Juror Christner answered, "No." *Id.* at 188. Defense counsel then specifically questioned Juror Christner regarding her friend's addiction to prescription drugs:

[Counsel]: . . . . The fact that you saw a friend go through a difficult situation,

albeit in that case involving prescription drugs, would that make it difficult for you to be fair in this case or to sit · in judgment in this case?

[Juror]:· No.

[Counsel]: Okay. You could separate that and simply look at the facts in this particular case?

[Juror]: Because they were two different situations.

[Counsel]: Sure. Sure. And you can take in mind the reasonable doubt, presumption of innocence, and consider all of that and just look at the facts?

[Juror]: Yes.

[Counsel]: Nothing of that is going to float through your mind and make this difficult, to say?

[Juror]: Yes, I can be fair.

*Id.* at 189. When defense counsel asked the potential jurors if any of them had ever been a victim of a crime, Juror Christner raised her hand and volunteered that she had been the victim of a theft three years ago and the thief was never apprehended. She indicated, however, that her previous victimization would not cause a problem with her consideration of the instant case. Finally, when asked by the defense, Juror Christner explained she is not quick at making decisions and tries to get all the facts and then weigh the pros and cons before making a decision.

It is evident that Juror Christner thoughtfully responded to questions and actively participated during *voir dire.* In light of the record ˙before us, we find it unlikely that Juror Christner remembered her past association with Caron, assuming one ever existed. Caron has failed to establish dishonesty or gross misconduct by Juror Christner rising to the level of fundamental error.

### 2.

Caron next argues his convictions violate the double jeopardy clause of the Indiana Constitution. Article 1, § 14 of the Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." In Indiana, the double jeopardy analysis involves dual inquires under what have come to be known as the "statutory elements test" and the "actual elements test." *Davis v. State,* 770 N.E.2d 319 (Ind.2002). Caron contends that his convictions of two dealing offenses violate the actual evidence test. That is, the evidentiary facts used by the factfinder to establish the essential elements of manufacturing offense were also used to establish all of the elements of the possession offense.

Under the actual evidence test, multiple convictions are prohibited if there is " 'a reasonable possibility that the evidentiary facts used by the fact-finder to establish the elements of one offense may also have been used to establish the essential elements of a second challenged offense.' " *Davis v. State,* 770 N.E.2d at 323 (quoting *Richardson v. State,* 717 N.E.2d 32, 53 (Ind.1999)). "Application of the actual evidence test requires us to identify the essential elements of each challenged crime and to evaluate the evidence from the jury's perspective, considering where relevant the jury instructions, argument of counsel, and other factors that may have guided the jury's determination." *Lamagna v. State,* 776 N.E.2d 955, 959 (Ind.Ct. App.2002). "Indiana's double jeopardy clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense." *Id.*

Here, Caron was charged and convicted of two violations of I.C. § 35–48–4–1, which provides in pertinent part as follows:

(a) A person who:
 (1) knowingly or intentionally:
 (A) manufactures;

 \* \* \*

 ... methamphetamine ...; or
 (2) possesses, with intent to:

 \* \* \*

 (C) deliver ...

 \* \* \*

 ... methamphetamine ...;
 commits dealing in ... methamphetamine, a Class B felony, except as provided in subsection (b).
(b) The offense is a Class A felony if:
 (1) the amount of the drug involved weighs three (3) grams or more;

 \* \* \*

Thus, although the convictions were both for dealing in methamphetamine, the charges were expressed in terms of possession of methamphetamine in excess of three grams with intent to deliver and manufacture of methamphetamine in excess of three grams.

On appeal, the State argues the convictions were supported by two separate and distinct instances of criminal conduct and, therefore, do not violate double jeopardy principles. While the reasonable possibility standard of the actual evidence test permits convictions of multiple offenses committed as part of a protracted criminal episode provided that the case is prosecuted in a manner that insures the same evidence is not used to support multiple verdicts, Caron's case was not so prosecuted. *See Curry v. State,* 740 N.E.2d 162 (Ind.Ct.App.2000), *trans. denied.* At trial, the State's theory of sepa-

rate conduct[6] was not presented to the jury through the trial court's instructions or the State's closing argument. The State chose to charge the crimes broadly, and its closing argument was no more specific. To establish the manufacturing offense, the State relied on a broad array of evidence to prove Caron and Storey manufactured methamphetamine in the field that day, resulting in 22.69 grams of finished product.[7] Evidence of the finished product found in the field was then used as the sole evidence to prove the possession offense.

Our review of the record reveals the State advanced the same evidence in support of both charges at trial. Therefore, we conclude there is at least a reasonable possibility the jury used the same evidence to establish the essential elements of the two offenses. *See Carroll v. State*, 740 N.E.2d 1225 (Ind.Ct.App.2000), *trans. denied.* As a result, we affirm Caron's conviction for the manufacturing offense and vacate his conviction and sentence for the possession offense.

### 3.

Finally, Caron challenges his enhanced sentence for the manufacturing offense. Relying on *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), Caron argues the trial court improperly enhanced his sentence based upon aggravating factors not determined beyond a reasonable doubt by a jury, an alleged violation of his Sixth Amendments rights.

In *Blakely*, the United States Supreme Court applied the rule set forth in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), which states that "[o]ther than the fact of a prior conviction any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Blakely*, in turn, defined the statutory maximum for *Apprendi* purposes as "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely v. Washington*, 542 U.S. at ——, 124 S.Ct. at 2537.

In the months following the *Blakely* decision, the courts of this state have struggled to gauge the decision's impact on Indiana, and this court in particular has been confronted with *Blakely* issues on a mounting scale. The State has consistently argued on appeal, as it does in the case at hand, that the defendant waived the issue by failing to object at trial and, in the alternative, that *Blakely* does not implicate Indiana's sentencing scheme. Our supreme court recently rejected these arguments in *Smylie v. State*, 823 N.E.2d 679

6. The State's argument based upon the offenses being committed at different times during the day is not particularly persuasive. We note, however, the State may have been able to support dual convictions by carefully parsing the evidence at trial. That is, the finished product from the initial batch could have been used to support the possession offense, and evidence regarding the second (unfinished) batch possibly could have been expanded upon to support the manufacturing offense as charged or a lesser charge.

7. The State correctly observes that the manufacturing process need not be completed before a defendant can be found to have manufactured methamphetamine. *See Dawson v. State*, 786 N.E.2d 742 (Ind.Ct.App.2003) (the evidence need only establish that the manufacturing process had begun), *trans. denied.* In the instant case, however, the State presented evidence of a completed process and an amount of finished product to establish the manufacturing offense. Moreover, the State did not focus on or attempt to develop the evidence regarding the unfinished, second batch of methamphetamine.

(Ind.2005). In *Smylie*, the court held, "portions of Indiana's sentencing scheme violate the Sixth Amendment's right to trial by jury" and "the new rule of *Blakely* should apply to all cases pending on direct review at the time *Blakely* was announced in which the appellant has adequately preserved appellate review of the sentence." 823 N.E.2d at 681–82.

■ Caron has adequately preserved appellate review of his sentence, as he expressly presented a *Blakely* claim in his brief on direct appeal. *See Smylie v. State,* 823 N.E.2d 679. Therefore, we turn to the merits of his claim.

As previously noted, the jury found Caron to have manufactured methamphetamine in excess of three grams, a class A felony. Pursuant to statute, conviction of a class A felony carries a sentencing range of twenty to fifty years and a presumptive sentence of thirty years. Ind.Code Ann. § 35–50–2–4 (West 2004). Thus, the statutory maximum for *Blakely* purposes is thirty years.

Here, the trial court imposed an enhanced sentence of thirty-five years. The court found the following aggravating circumstances: 1) Caron's prior criminal history (two felony convictions and one misdemeanor); 2) his probationary status at the time of the instant offense;[8] 3) his need for rehabilitative treatment in a penal facility for an extended period of time; 4) his failure to pay child support, indicating an unwillingness to follow court orders; 5) at age fifty, Caron is old enough to know better than to violate Indiana's criminal laws; 6) his trial testimony was not believable or credible; and, 7) Caron used illegal drugs for recreational purposes. The trial court expressly determined that these aggravating circumstances outweighed the two mitigating circumstances listed by the court (Caron's history of seizures and his in-court apology to his family).

■ We initially observe that Caron admitted the second and fifth aggravators at the sentencing hearing. With regard to probation, defense counsel explained that a probation violation resulted from the arrest in the instant case. *See Appellant's Appendix* at 163 (defense counsel stated: "As a result of [the arrest], he, in fact, did violate probation"). Moreover, the presentence investigation report (PSI) shows that he was on probation at the time of the instant offense and that a probation violation was filed followed by a failure to appear at the probation hearing. Caron acknowledged at the sentencing hearing that the PSI was accurate in this regard. Upon questioning by the trial court, Caron also admitted that he was old enough to know better than to violate Indiana's criminal laws. In light of Caron's admissions, these aggravating circumstances are not problematic under *Blakely*. *See Teeters v. State,* 817 N.E.2d 275, 279 (Ind.Ct.App. 2004) ("[a] fact that is admitted by the defendant does not run afoul of the *Blakely/Apprendi* constitutional requirements"), *trans. denied.*

■ We further observe that prior convictions as shown by a defendant's criminal history are expressly exempt from the *Apprendi* rule as clarified by *Blakely*. *See Carson v. State,* 813 N.E.2d 1187 (Ind.Ct.App.2004). As the trial court observed, Caron has two prior convictions for drug-related offenses. He also has a recent felony conviction for nonsupport of a dependant child.[9] Thus, the first (crimi-

---

8. In particular, the trial court noted the probation violation that resulted from Caron's arrest for the instant offense and his subsequent failure to appear at the probation hearing.

9. According to the PSI, Caron's estimated child support arrearage was $8000 at the time of sentencing.

nal history) and fourth (failure to pay child support) aggravators do not implicate the *Blakely* analysis because they are based upon his prior convictions. Similarly, the third aggravator is permissible because it is derivative of Caron's criminal history.[10] *See Bledsoe v. State*, 815 N.E.2d 507 (Ind. Ct.App.2004) (trial court's finding that defendant's rehabilitation could only occur in a penal institution was derived from defendant's criminal history), *trans. denied.*

On the other hand, the sixth and seventh aggravators found by the trial court may be problematic. With regard to the sixth aggravator, the trial court expressly found Caron's testimony at trial was not believable or credible "as determined by the jury." *Appellant's Appendix* at 119. The State similarly argues on appeal that the guilty verdict necessarily indicated the jury did not believe Caron's testimony. While we find this argument interesting, we need not resolve the issue for the reason discussed below. With respect to the final aggravator, Caron's recreational drug use, the State asserts Caron admitted the facts supporting this aggravator at the sentencing hearing. We note, however, that at the sentencing hearing Caron qualified his statement regarding his recreational drug use, which was contained in the PSI, and noted that it was made in reference to when he started using drugs back in the 1970s. We need not determine whether the two remaining aggravators violate *Blakely*, because any error in this regard would be harmless.

As we have noted on a number of occasions, a single valid aggravating circumstance may be sufficient to sustain an enhanced sentence. *See, e.g., Teeters v. State*, 817 N.E.2d 275. More-

over, when the trial court improperly applies aggravating circumstances but other valid aggravating circumstances exist, a sentence enhancement may still be upheld. *See Bacher v. State*, 722 N.E.2d 799 (Ind. 2000). The five aggravating circumstances previously sustained adequately support the five-year enhancement of Caron's sentence, and we can say with confidence that the enhanced sentence is appropriate without considering the validity of the two remaining aggravating circumstances. *See Witmer v. State*, 800 N.E.2d 571 (Ind.2003).

Judgment affirmed in part and reversed in part.

SHARPNACK, J., and BAKER, J., concur.

---

10. The trial court explained Caron was in need of an extended period of incarceration because "prior incarcerations for short periods of time, fines, costs and probation have proved unsuccessful in rehabilitating this particular Defendant". *Appellant's Appendix* at 118–19.