**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**STANLEY L. CAMPBELL**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

SCHWALA ROYAL,                    )
                                  )
    Appellant-Defendant,          )
                                  )
        vs.                     )     No. 02A04-1108-CR-486
                                  )
STATE OF INDIANA,                 )
                                  )
    Appellee-Plaintiff.           )

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Wendy W. Davis, Judge
Cause No. 02D05-1104-FD-493

**March 23, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Schwala Royal appeals her conviction of Prostitution[1] as a class D felony. Royal presents the following restated issues for review:

1.    Did the trial court err in denying Royal's *Batson* challenge?

2.    Did the trial court err in denying Royal's motion for mistrial?

3.    Is the evidence sufficient to support the conviction?

We affirm.

The facts favorable to the convictions are that at approximately 10 p.m. on March 31, 2011, Detective Jeffrey Ripley of the Fort Wayne Police Department was working undercover in an area of Fort Wayne that was known for drugs and prostitution. He saw Royal walking down the street and waving at cars. He was familiar with Royal as a result of a prior arrest for prostitution. At the time, however, Detective Ripley was unable to stop. He saw her again approximately three hours later. This time, Royal was standing on a sidewalk "frantically" waiving her arms and yelling at him to stop his vehicle. *Transcript* at 97. After he stopped, Royal approached and then entered his car. He asked what she was doing and she responded she "was out hustling." *Id*. at 99. From his experience, Detective Ripley understood this as a reference to soliciting sex for money.

Detective Ripley described what happened next:

We talked about the hustling that she referred it [sic] to, making small talk. I then asked [Royal], excuse my wordage, but she then asked me what I was doing and I advised that I was looking to get a blow job or some pussy, which is street slang for oral sex or vaginal sex. And then I-I offered her $20.00 at the time and at the time [Royal] would not answer my question or respond to me in any way. Then she asked me if I would drive her to a location. I said I could. I asked her where she wanted me to drive her to. She said that she

---

[1]    Ind. Code Ann. § 35-45-4-2 (West, Westlaw through end of 2011 1st Regular Sess.).

2

needed me to take her to a bootlegger's place and a bootlegger is another term for an individual that sells alcohol illegally without a permit. So I said I'd be more than happy to and began driving towards that location where she told me.

*Id.* at 100. As they drove, Detective Ripley observed that Royal turned around and started looking out the rear window of the car. She also monitored the side mirrors of the car, which, according to Detective Ripley, "is common for drug dealers slash prostitutes to do to make sure they weren't being followed by an undercover cop or a marked unit." *Id.* at 101. When they reached Royal's desired destination, Royal asked Detective Ripley to give her ten dollars. He agreed, but only after Royal agreed to leave her jacket in the car to ensure that she did not abscond with the money. When she returned, Royal informed Detective Ripley that they would have to drive to a different location. She began to question Detective Ripley "a lot", including the question of whether he was a police officer. *Id.* at 104. When he responded that he was not a police officer, they drove away.

Detective Ripley again offered to pay Royal $20, and then $40, to perform oral sex on him. She did not respond verbally, but "began shaking her head yes." *Id.* at 105. She then began to rub Detective Ripley's penis on the outside of his pants, which, according to the officer, "is a common practice for them to do, make sure you're not a police officer, but a john." *Id.* This apparently is based upon the belief that undercover police officers are "not allowed to let [prostitutes] touch [them]." *Id.* At that point, Royal lifted Detective Ripley's shirt to check for a body wire and found none. Detective Ripley again asked for a blow job for $40 and Royal again "began shaking her head yes." *Id.*

As they drove, Royal again asked Detective Ripley if he was a police officer. At that point, her attitude "really changed." *Id.* at 106. She began to "really watch[] her … outside

3

mirrors, looking behind her, check the vehicles." *Id.* She also began telling Detective Ripley that she was not a prostitute, but that she could take him to a house where he could engage the services of prostitutes. By that time, however, Detective Ripley had already given the "pre-determined takedown signal" to nearby uniformed detectives. *Id.* at 107. At that point, a uniformed officer executed a traffic stop of Detective Ripley's vehicle and arrested Royal for prostitution.

Royal was charged under Count I with prostitution as a class A misdemeanor. She was charged under Count II with prostitution, enhanced to a class D felony as a result of two prior convictions for prostitution. The case proceeded to a two-phase jury trial, with the counts to be tried separately. The jury returned a verdict of guilty as charged with respect to Count I. After that verdict was returned, Royal stipulated that she had two prior convictions for prostitution and therefore would plead guilty to Count II. The trial court entered judgment of conviction on Count II and, following a hearing, sentenced Royal to two and one-half years in jail, with one year executed and the remainder suspended to probation. Further facts will be provided where relevant.

1.

During voir dire, the State exercised one of its peremptory challenges on Juror 10, who happened to be the only African-American person in the jury pool. Royal objected on *Batson*[2] grounds, i.e., that the State violated the Equal Protection Clause of the Fourteenth Amendment by using a peremptory challenge to strike Juror 10 solely on the basis of race. The State offered a race-neutral reason, and the trial court excused Juror 10 over Royal's

4

objection.  Royal contends the trial court erred in denying her *Batson* challenge.

In *Batson*, the United States Supreme Court determined that the Equal Protection Clause of the Fourteenth Amendment is violated when a prosecutor uses a peremptory challenge to strike a potential juror solely on the basis of race. The *Batson* Court developed the following test to determine whether a peremptory challenge has been used improperly to disqualify a potential juror on the basis of race: (1) The party contesting the peremptory challenge must make a prima facie showing of discrimination on the basis of race; (2) after this is done, the burden shifts to the party exercising its peremptory challenge to present a race-neutral explanation for using the challenge; and (3) if a race-neutral explanation is proffered, the trial court must decide whether the challenger has carried its burden of proving purposeful discrimination.  *Highler v. State*, 854 N.E.2d 823 (Ind. 2006).

Our Supreme Court has also held that in order to "make a prima facie case of purposeful discrimination, the defendant must show that the excused juror was a member of a cognizable racial group and present an inference that the juror was excluded because of his or her race." *Id.* at 827.  The court has further held that although the removal of some African American jurors by the use of peremptory challenges does not, standing alone, raise an inference of racial discrimination, "the removal of 'the only ... African American juror that could have served on the petit jury' does 'raise an inference that the juror was excluded on the basis of race.'"  *Id.* (quoting *McCants v. State*, 686 N.E.2d 1281, 1284 (Ind. 1997)).  In the instant case, after the State moved to strike Juror 10, Royal objected on *Batson* grounds, pointing out that Juror 10 was the only African-American in the jury pool.  This was

---

2    *See Batson v. Kentucky*, 476 U.S. 79 (1986).

sufficient to shift the burden to the State to present a race neutral explanation for removing Juror 10.

During voir dire, the prosecutor questioned prospective jurors about their ability to vote to convict someone of the crime of prostitution. One of the jurors responded that she would want to know why the defendant had engaged in the act of prostitution. The prosecutor asked whether the juror understood that such motivation was not an element of the offense and the State might not offer evidence on that question. Juror 10, the juror in question, then chimed in, stating:

> I kind of agree with her. To me it depends on the reason, 'cause I feel until I walked in her shoes, I don't know. … And I think prostitution, it's a lot of other crimes more serious than that, so to me, I haven't walked in her shoes. I don't know what the, you know.

*Transcript* at 31-32. The prosecutor and Juror 10 had the following discussion:

> [State]: [S]exual intercourse or deviant sexual conduct for money or other property. That's – those are the elements. Those are the things that you're going to get. Those are the things that you're going to hear. Will you hear why? Maybe. Maybe not. [Juror 10], if you don't hear why, why she did this, is that going to be a problem for you.
>
> JUROR 10: It probably is.
>
> [State]: Okay. If you don't hear why, would you be able to come back with a verdict of guilty or not guilty?
>
> JUROR 10: I would go by the facts, 'cause a lot of police be liars, too.
>
> [State]: Okay.
>
> JUROR 10: So I would go back to the facts.
>
> [State]: I'm sorry. Back - I didn't hear that last part. A lot of police do what? I'm sorry.

JUROR 10:    They lie too, so I'm going to go by the facts.

[State]:       Okay. Okay.

JUROR:        They make mistakes just like we do.

[State]:       Okay. All right. The question though is, if you don't hear why, why somebody did something, you just get the facts, but you don't hear why, are you going to be comfortable with finding a person guilty?

JUROR 10:    I'm not sure.

[State]:       Okay.

JUROR 10:    'Cause the reason could make a difference to me. I know the law is the law, you know what I'm saying?

[State]:       Uh-huh.

JUROR 10:    But people do things for different reasons.

[State]:       And I appreciate your answer.

JUROR 10:    And if I don't have no food, I might do that. If I can't feed my kids, I might do that.

*   *   *   *   *

[State]:       Seat Number 11, I couldn't have put it better. Your job is to hear those facts and did the State present those facts so that you are left firmly convinced that this crime happened? Those facts don't include why. You may or may not get them. Anybody uncomfortable with that? *** And it's okay. It's okay to be uncomfortable with that. That is fine. But I do need to know that, because this is the State's job and if you're telling me you're uncomfortable –

JUROR 10:    I'm uncomfortable.

*Id.* at 32-36.

7

Our Supreme Court has stated that a "race-neutral explanation means 'an explanation based on something other than the race of the juror.'" *Highler v. State*, 854 N.E.2d at 827 (quoting *Hernandez v. New York,* 500 U.S. 352, 360 (1991) (plurality)). The Court has determined that a prosecutor's reason must constitute more than a mere denial of improper motive, but that it "does not demand an explanation that is persuasive, or even plausible." *Id*. (quoting *Purkett v. Elem,* 514 U.S. 765, 767–768 (1995), *reh'g denied* (per curiam)). Therefore, if the reason is not inherently discriminatory, it passes the second step. "'[T]he issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason will be deemed race neutral.'" *Id.* (quoting *Purkett v. Elem,* 514 U.S. at 767–768).

The State explained that its preemptory challenge to Juror 10 was based upon the views expressed above, i.e., that she would want to know why the defendant prostituted herself and, depending upon what the juror learned about that motivation, Juror 10 might not consider the act of prostitution a crime. Although she was told on several occasions that such motivation was not an element of the offense and that the State may not present evidence on that matter, Juror 10 indicated she would be "uncomfortable" voting to convict without knowing that information. *Transcript* at 36. The State explained that these views raised legitimate questions about Juror 10's ability to be fair and impartial and to return a guilty verdict based upon the evidence. The State's reason for striking Juror 10 was on its face race-neutral and required the trial court to proceed to the third step and determine whether Royal had established purposeful discrimination. *See Highler v. State*, 854 N.E.2d 823.

The third step requires an evaluation of "'the persuasiveness of the justification'"

8

proffered by the State, while bearing in mind that "'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" *Id.* at 828 (quoting *Purkett v. Elem,* 514 U.S. at 768). We have reviewed Juror 10's comments and the State's expressed concerns, in light of those comments, about her ability to discharge her duty to reach a verdict based upon the evidence relative to the elements of the crime charged. We find them reasonable. The trial court accepted the State's explanations, and thereby found no discriminatory intent. The finding regarding discriminatory intent in this context is a factual matter to be resolved by the trial court. *Purkett v. Elem,* 514 U.S. 765. As such, we will not set it aside unless it is clearly erroneous. *See Highler v. State*, 854 N.E.2d 823. We cannot conclude the trial court was clearly erroneous in accepting the State's explanations.

2.

One of the jurors, Juror 1, neglected to inform the court that she was a second cousin[3] of a police officer who was involved at some point in Royal's case. Upon discovering this relationship, Royal requested a mistrial. She contends the trial court erred in denying her motion for mistrial.

Our standard of review with respect to this issue is well settled.

Whether to grant or deny a motion for a mistrial is a decision left to the sound discretion of the trial court, as that court is in the best position to assess the circumstances of an error and its probable impact upon the jury. On appeal, we will reverse only upon an abuse of that discretion. To prevail on appeal

---

[3] The parties explain that the officer in question was the child of Juror 1's cousin. Persons thus related are generally, though inaccurately, described as second cousins. The child of a first cousin, however, is not a second cousin, but instead a first cousin once removed. "Second cousin" describes the relationship between the children of first cousins. Be that as it may, for ease of understanding, we will continue to use the relationship label applied by the parties, i.e., second cousin.

from the denial of a motion for a mistrial, the appellant must demonstrate the statement or conduct in question was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected. The gravity of the peril is assessed by the probable persuasive effect of the misconduct upon the jury's decision rather than upon the degree of impropriety of the conduct. "A mistrial is an extreme remedy that is warranted only when less severe remedies will not satisfactorily correct the error."

*Stokes v. State*, 922 N.E.2d 758, 762-63 (Ind. Ct. App. 2010) (quoting *Warren v. State,* 725 N.E.2d 828, 833 (Ind. 2000)), *trans. denied*.

Generally, proof that a juror lied on voir dire entitles the defendant to a new trial. *Lopez v. State*, 527 N.E.2d 1119 (Ind. 1988); *see also Dickenson v. State,* 732 N.E.2d 238, 241 (Ind. Ct. App. 2000) ("[i]t is misconduct for a juror to make false statements in response to questions on *voir dire* examination, and such is held to constitute reversible error because it impairs the right to challenge the juror, either peremptorily or for cause"). To warrant a new trial on these grounds, there must be a showing that the misconduct was gross, and that it probably harmed the defendant. *Caron v. State*, 824 N.E.2d 745 (Ind. Ct. App. 2005), *trans. denied*. The issue of juror misconduct is a matter committed to the trial court's discretion. *Lopez v. State*, 527 N.E.2d 1119.

During voir dire, the court asked the prospective jurors the following question: "Have any of you or a member of your immediate family or close personal friend ever served as a law enforcement officer?" *Transcript* at 9-10. Four jurors, identified in the trial transcript as Jurors 11, 12, 32, and 42, raised their hands. Those jurors were later questioned about their responses. Ultimately, Jurors 11 and 12 were excused, while Jurors 32 and 42 were seated on the panel. Just before trial was to commence, the State informed the court that Juror 1, who

10

had not raised her hand in response to the aforementioned question, was in fact related to a police officer that the State had listed as a witness, but whom it did not intend to call at trial. The State learned of this when the officer appeared at the courthouse before learning that he would not be called as a witness. At some point, apparently after voir dire, he stated, "oh, that lady in Seat Number 1 is my cousin. She's related to a number of Fort Wayne Police Department officers." *Id*. at 61. Royal immediately moved for a mistrial. The court took the motion under advisement and determined that before it ruled, it would permit the parties to question Juror 1 about her response to the question. The following excerpt contains the relevant portion of that discussion:

> [State]: …But one of the things that we were curious about is when we were asking about whether there are any friends or family members of the Fort Wayne Police Officers, I apologize, I do not recall you raising your hand?
>
> JUROR 1: I did not say that. And you know what? I served on a trial before and I, you know, I just assume you're talking like people that you see on a regular basis that you would actually talk to about that.

*Id*. at 65. Juror 1 went on to explain that the officer in question was the son of her cousin and although they had spent some time together when they were young, after he grew up and joined the police force, they did not see each other "all that much." *Id*. at 68.

We begin with the observation that Juror 1's answer to the relevant question was not untruthful. The prospective jurors were asked whether a member of their "immediate family or close personal friend" had served as a police officer. The adjective "immediate" as used here was not defined, but in common parlance would be understood to refer to the smallest unit of a family with which an individual lives, including parents, siblings, spouse, children, and almost certainly including grandparents and grandchildren. It would not be understood

11

to refer to second cousins. The officer in question was neither a member of her immediate family nor, by Juror 1's own account, a close personal friend. It appears that this issue arose either because the parties misperceived the exact nature of the question asked, or because the trial court phrased it inartfully, at least with respect to the information it was intended to elicit. Regardless, Juror 1's response (or lack thereof) was truthful. We therefore need not proceed further with the analysis applicable to an untruthful juror response.

Moreover, we note that in order to succeed even had there been misconduct, a new trial would be warranted only upon a showing of probable harm. *Caron v. State*, 824 N.E.2d 745. In this case, Juror 1 testified that she would be able to make a decision based only upon the evidence presented and would not be biased by virtue of her familial relationship to police officers. The trial court did not err in denying Royal's motion for mistrial.

3.

Royal contends the evidence was insufficient to support the convictions. Specifically, Royal contends the evidence was not sufficient to prove she accepted the undercover officer's request to perform a sexual act for money. Our standard of reviewing challenges to the sufficiency of the evidence supporting a criminal conviction is well settled.

> When reviewing a claim that the evidence introduced at trial was insufficient to support a conviction, we consider only the probative evidence and reasonable inferences that support the trial court's finding of guilt. We likewise consider conflicting evidence in the light most favorable to the trial court's finding. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. Instead, we will affirm the conviction unless no reasonable trier of fact could have found the elements of the crime beyond a reasonable doubt.

*Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011). When considering a challenge to the

12

evidence, we neither reweigh the evidence nor assess the credibility of witnesses. *Turner v. State*, 953 N.E.2d 1039 (Ind. 2011).

To establish that Royal committed class D felony prostitution, the State was required to prove, in relevant part, that Royal knowingly or intentionally performed, offered, or agreed to perform sexual intercourse or deviate sexual conduct for money or other property. *See* I.C. § 35-45-04-2. Royal approached Detective Ripley's stopped car and responded that she was "out hustling" when he asked her what she was doing. *Transcript* at 99. She then got into his car and they drove away. While he was driving, Detective Ripley offered to pay Royal $40 to perform oral sex on him. She responded on two separate occasions by "shaking her head yes", *id*. at 105, and once by rubbing his penis on the outside of his pants after nodding her head. Royal's nodding of her head in response to the detective's offer of a specific amount of money for a specific sex act established a meeting of the minds (i.e., an agreement) between Detective Ripley and Royal to exchange money for one of the proscribed sex acts. Her denial that she shook her head "yes" or that doing such is sufficient indicia of agreement is merely a request to reweigh the evidence, which is beyond our purview upon appeal. *See Turner v. State*, 953 N.E.2d 1039. The evidence was sufficient to support Royal's class D felony prostitution conviction.

Judgment affirmed.

RILEY, J., and BARNES, J., concur.

13